Harry E. BECK, Jr.; Doris R. Ambrose; Jacqueline S. Brandon; Mary Anna Cox; Sally B. DiMauro; Rue T.F. Downey; Kathleen A. Heil; John J. Hurley; Harriett Lipschultz; Clay B. Lutz; Barbara McGaughey; Roland R. Merkle; Ethel T. Merryman; Doris J. Morrow; Marion F. Northrop; Frances M. Philips; Vivian Reedy; Barbara A. Russell; Lois A. Stallings; Harry B. Swartz, Sr., Appellees,

v.

COMMUNICATIONS WORKERS OF AMERICA (C.W.A.), an unincorporated Labor Organization; C.W.A. Committee on Political Education (C.W.A. COPE); C.W.A. District II; Local 2100 of C.W.A.; Local 2101 of C.W.A.; Local 2108 of C.W.A.; Local 2110 of C.W.A., Appellants,

and

Local 2350 of C.W.A.; American Federation of Labor-Congress of Industrial Organizations (AFL–CIO), a Federation of National and International Labor Organizations; AFL–CIO Committee on Political Education; Maryland State AFL–CIO; American Telephone & Telegraph, a Corporation; C & P Telephone Company of Maryland, a Corporation, Defendants.

Harry E. BECK, Jr.; Doris R. Ambrose; Jacqueline S. Brandon; Mary Anna Cox; Sally B. DiMauro; Rue T.F. Downey; Kathleen A. Heil; John J. Hurley; Harriett Lipschultz; Clay B. Lutz; Barbara McGaughey; Roland R. Merkle; Ethel T. Merryman; Doris J. Morrow; Marion F. Northrop; Frances M. Philips; Vivian Reedy; Barbara A. Russell; Lois A. Stallings; Harry B. Swartz, Sr., Appellants,

v.

COMMUNICATIONS WORKERS OF AMERICA (C.W.A.), an unincorporated Labor Organization; C.W.A. Committee on Political Education (C.W.A. COPE); C.W.A. District II; Local 2100 of C.W.A.; Local 2101 of C.W.A.; Local 2108 of C.W.A.; Local 2110 of C.W.A., Appellees,

and

Local 2350 of C.W.A.; American Federation of Labor-Congress of Industrial Organizations (AFL–CIO), a Federation of National and International Labor Organizations; AFL–CIO Committee on Political Education; Maryland State AFL–CIO; American Telephone & Telegraph, a Corporation; C & P Telephone Company of Maryland, a Corporation, Defendants.

Nos. 83–1955, 83–1956.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 1, 1984.

Decided Oct. 24, 1985.

Laurence Gold, Washington, D.C. (James Coppess; George Kaufmann, Washington, D.C., on brief), for appellants/cross-appellees.

Edwin Vieira, Jr., Manassas, Va. (Joseph J. Hahn, Chicago, Ill., on brief), for appellees/cross-appellants.

Before WINTER, Chief Judge, and RUSSELL and CHAPMAN, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

Plaintiffs in this suit are twenty non-union employees[1] of either the American Telephone and Telegraph Company (AT & T) or its subsidiary Chesapeake and Potomac Telephone Company (C & P) and, as such, are subject to an "agency shop" agreement[2] negotiated between the employers and the Communications Workers of America (CWA) and its locals as the exclusive bargaining agents of such employees under the terms of section 8(a)(3) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(3).[3]  Plaintiffs are required under the agreement to pay agency fees to CWA through its locals in an amount equivalent to the dues paid by union members.  Their complaint is that defendants CWA and its locals have expended a part of their agency fees for purposes unrelated to "collective bargaining, contract administration, and grievance adjustment."  Plaintiffs' claim such expenditures constitute a violation of their First Amendment rights of free speech and association justiciable under 28 U.S.C. § 1331 and 42 U.S.C. § 1983, and a violation of defendants' duty to fairly represent all employees justifiable under 28 U.S.C. § 1337 and 29 U.S.C. § 185(a).[4]  Plaintiffs sought a declaratory judgment against defendants establishing the illegality of the excessive exactions, injunctive relief against continued illegal exactions by CWA and its locals, and monetary judgment for past illegal collections by CWA and its locals.

CWA alleged in its answer that "all actions taken by CWA defendants [were] consistent with the duties and obligations imposed [upon CWA] as recognized or certified collective bargaining representative of the plaintiffs under the National Labor Relations Act."  They also asserted that plaintiffs were without standing to maintain the action, that plaintiffs had failed to

---

1.  A number of other employees joined as plaintiffs while suit was proceeding.

2.  Professor Cantor has explained that an agreement as authorized under § 8(a)(3) creates actually an "agency shop":

    Although the statutory language refers to union 'membership' as a condition of employment, the NLRA has been interpreted to refer to 'financial core membership' rather than full union membership.  Thus what appears to be a union shop authorization is actually an agency shop authorization.

    Cantor, *Uses and Abuses of the Agency Shop*, 59 Notre Dame L.Rev. 61 n. 2 (1983).

3.  Plaintiffs' employers and the AFL-CIO were named as defendants in the complaint, but on motion they were dismissed as defendants leaving only CWA and its locals as defendants in the action.  There is no appeal from this dismissal.

4.  Jurisdiction in actions such as this are sometimes sustained under 28 U.S.C. § 1337, and at other times under § 185 of the Labor-Management Relations Act, 29 U.S.C. § 185, or under both.  For an instance of an action maintained under § 185, *see Reid v. McDonnell Douglas Corp.*, 443 F.2d 408, 411–12 (10th Cir.1971).  The action, however, was later dismissed on the ground that the union had "adopted a complying intra-union remedy" in the form of a good faith rebate procedure.  *Reid v. International Union*, 479 F.2d 517, 520 (10th Cir.) *cert. denied*, 414 U.S. 1076, 94 S.Ct. 592, 38 L.Ed.2d 483 (1973).

exhaust available internal union remedies, that the court lacked jurisdiction over the subject matter of the action, and that the action was barred by the statute of limitations.

After informal discovery, defendant CWA moved to dismiss the action for failure of plaintiffs first to exhaust internal union procedures or, alternatively, for a stay pending such exhaustion.[5] CWA submitted in support of the motion a resolution of the Executive Committee of CWA adopted on June 19, 1974. This resolution provided that:

> Any member or non-member who is covered by a collective bargaining agreement containing a 'Union Shop' or 'Agency Shop' provision shall have the right to object to the expenditure of a portion of dues or agency fees for activities or causes primarily political in nature, and shall be entitled to the refund of a portion of such dues under the terms, conditions and procedures contained in this statement of policy.

The resolution further provided that the Administrative Committee of the Executive Board of CWA should determine the approximate annual proportion of dues or agency fees spent for activities or causes primarily political in nature as of March 31st of each year. By affidavit, defendants said that for the year ending March 31, 1976, the impermissible expenditures for political purposes amounted to 7.63 percent of the fees collected. CWA also alleged that its auditors were attempting to arrive at, for use in succeeding years, a figure estimating the proportion of expenditures made by the unions for political purposes. Should any member or non-member object to the allocation determination, he could appeal to the Executive Board and from the Executive Board to the Union Convention.[6]

The district judge advised both parties that, preliminary to a hearing on defendants' motion for summary judgment based on their rebate procedure, he wished the advice of counsel on the impact of *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) on the issues in the case. Counsel for CWA responded in a letter dated June 3, 1977 and incorporated as a part of the record in this case. After indicating that *Street*[7] and *Hanson*[8] arose under the RLA and that *Abood* dealt with public employees, CWA's

---

**5.** It is significant that defendants did not in their motion to dismiss raise the jurisdictional objection that plaintiffs' constitutional claim failed because of the alleged absence of "state action," though several years later, as we later note, they raised this point.

**6.** There can be little doubt that this resolution had its genesis in *Brotherhood of Ry. and S.S. Clerks v. Allen*, 373 U.S. 113, 122, 83 S.Ct. 1158, 1163–64, 10 L.Ed.2d 235 (1963), in which the Supreme Court, in dealing with objections to the exaction under the Railway Labor Act (RLA) of union dues to be used for impermissible purposes, threw out this observation: "The difficulties in judicially administered relief [in fashioning a remedy for a violation under the RLA] ... should, we think, encourage petitioner unions to consider the adoption by their membership of some voluntary plan by which dissenters would be afforded an internal union remedy." This idea was repeated in *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 240, 97 S.Ct. 1782, 1802, 52 L.Ed.2d 261 (1977).

As a result of this observation, unions generally developed rebate schemes somewhat similar to that adopted by CWA and such rebate schemes became the first line of defense by unions in suits such as this one. Many of these rebate schemes, however, were fairer than the one involved in this case, where the right of appeal by the dissenting employees is restricted to a union-constituted body and never to an impartial board. *Cf. Ellis v. Brotherhood of Ry., Airline and S.S. Clerks*, 685 F.2d 1065, 1069 (9th Cir.1982), in which "[a]ny employee who believes his or her rebate inadequate may appeal directly to an independent Public Review Board authorized to make final determinations on such appeals." The rebate scheme in *Ellis*, with its more impartial appeal scheme, was, however, found invalid on other grounds by the Supreme Court in *Ellis v. Brotherhood of Ry., Airline and S.S. Clerks*, 466 U.S. 435, ——, 104 S.Ct. 1883, 1889–90, 80 L.Ed.2d 428, 439 (1984). Prior to *Ellis*, courts had varied in their treatment of this defense. *Reid v. International Union*, 479 F.2d at 520; *Perry v. Local Lodge 2569*, 708 F.2d 1258, 1262 (7th Cir.1983).

**7.** *International Ass'n of Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961).

**8.** *Railway Employee's Dept. v. Hanson*, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 112 (1956).

counsel expressed the opinion that *Abood* was not directly in point. But he added:

> The principal opinion's discussion [in *Abood* ] of national labor policy and decisions under the National Labor Relations Act would seem to indicate that the principles of *Hanson* and *Street* interpreting the Railway Labor Act apply equally to non-railway employees. Several lesser courts have so held. The problem is that the Supreme Court appears to use the terms 'ideological purpose,' 'political purposes,' and 'purposes other than collective bargaining,' interchangeably. The Court gives little guidance as to which expenditures it considers to be refundable to an agency fee payor.

CWA's counsel concluded his letter with this statement:

> If plaintiffs are willing to agree that the Supreme Court decisions mean only that the Union defendants must make a provision for pro-rata refund of that portion of the dues dollar expended upon political activities, the procedure is in effect [under the resolution of the Executive Committee] and this case should be settled. If plaintiffs intend to insist upon a much broader interpretation of those expenses for which they feel they are not responsible, no settlement is in sight.... [and plaintiffs must proceed under the appeal procedure established by the resolution.][9]

Plaintiffs did not agree to submission to CWA's internal union remedies and the matter came on for determination by the district judge. Finding exhaustion of internal union remedies not required,[10] the district judge proceeded to find that the agency shop agreement was valid subject to the limitation that CWA could not "collect and disburse [as the exclusive bargaining agent under such agreement] such 'agency fees' for purposes other than 'collective bargaining, contract administration, and grievance adjustment' without seriously implicating

the first amendment rights of free speech and association of fee payors who object." *Beck v. Communications Workers,* 468 F.Supp. 93, 96 (D.Md.1979) (quoting *Abood,* 431 U.S. at 225–226, 97 S.Ct. at 1794–1795). On the basis of that finding, he denied defendants' motion to dismiss and granted a declaratory judgment that collections by the union from objecting employees in an amount "beyond that allocable to collective bargaining, contract administration and grievance adjustment" were illegal as violative of "the first amendment rights of the plaintiffs." 468 F.Supp. at 97. He ruled that it was necessary to determine "what proportion of the union's total expenditures is attributable to activities other than collective bargaining, contract administration and grievance adjustment," and, in that determination, he said: "[t]he burden of proving such proportion rests upon the union, but '[a]bsolute precision in the calculation of such proportion is not, of course, to be expected or required.'" *Id.* (quoting *Allen,* 373 U.S. at 122, 83 S.Ct. at 1163–64). Finally, he provided that if the parties were unable to agree within thirty days on the amount to be refunded under the guidelines as stated by him, the matter of allocation should be referred to a master for the purpose of determining "what portion of the agency fees the defendant has collected improperly."

Since there was no agreement between the parties on the proper allocation, a special master was appointed. At the initial hearings before him, the special master received twenty-eight days of testimony and argument as well as 2,100 documentary exhibits. In his first report, filed August 18, 1980, he found that only 19 percent of CWA's total expenditures were related to and were reasonably necessary for the proper effectuation of permissible purposes. The special master accordingly recommended that CWA be ordered to refund to plaintiffs 81 percent of the agency fees

---

9. It will be noted that defendants did not in this letter raise or indicate that there was any jurisdictional defect in the proceedings.

10. There is no appeal from this decision. The inadmissibility of the exhaustion defense, with its reliance on the union's rebate procedure, is therefore not an issue on this appeal.

collected in the past and that CWA be enjoined from collecting from plaintiffs more than 19 percent of the dues and assessments charged CWA members.

After the filing of the special master's report, CWA moved the district court to remand the matter to the special master. In support of the motion, CWA filed a memorandum stating:

A re-reference is initially required because the master failed to determine the extent of the plaintiffs' financial obligation as to the 60% of the agency fees retained by the local union, although the issue was part of the reference to the master. Re-reference to the master is also appropriate because the national union is prepared promptly to provide a new basis for the determination of its future entitlement, a circumstance which the master recognized would warrant further proceedings and, upon proper proof, an injunction different from the terms proposed in the master's August 1980 report. *The national union proposes to meet the master's proof requirements by (1) offering a full return to the plaintiffs of their entire fee payment to the national union from its beginning in 1976 to the end of the present fiscal year [1980], and (2) utilization during the final third of the national union's 1980 fiscal year, which commences on December 1, 1980 of contemporaneous time records for officers and employees which will provide a basis for determination of the plaintiffs' financial obligation to the national union thereafter.* (emphasis added)[11]

Time for filing exceptions to the report of the special master was extended until after determination of the motion to recommit. In the meantime, Laurence Gold, Esquire, had been retained as lead counsel for

CWA in this litigation. He wrote counsel for plaintiffs a letter dated October 16, 1980, made a part of the record in this proceeding, in which he proposed:

As a result of my discussions with the CWA national union, I have now been authorized to advise you that the national offers to pay to the individual plaintiffs in the above-noted case the full amount of monies paid by them as agency fees to the defendant CWA national union from January 1, 1976 to date and to waive such fees through the balance of the national's current budget year, *provided* that the parties can agree upon, and the District Court will enter, an order which will preserve for review without any *res judicata* or estoppel effect all issues which either party may wish to raise with respect to: (a) Judge Blair's rulings regarding the expenditures which may and may not lawfully be charged to agency fee payors and (b) all rulings of the master other than his factual findings allocating expenditures in accordance with those rulings.[12]

The district judge proceeded to grant the motion to recommit, but in so doing, he identified precisely the issues to be addressed on the recommital and provided that those issues should be resolved without further testimony unless the special master "deems it appropriate." *Beck v. Communications Workers*, No. M–76–839, slip op. at 3 (D.Md. Jan. 19, 1981). In connection with the objection of defendants to the absence of specific findings on the liability of the local unions, the district judge directed the special master to make findings in response to these questions:

(1) What portion of the fees paid were retained by the local union defendants, and what portion was paid over to defendant CWA;

---

**11.** Again, it is of interest that defendants at this point did not indicate that a jurisdictional problem existed. Actually, the statement of position suggested that defendants in effect conceded the partial invalidity of their collection and use of the dues-equivalent and thus conceded partial liability.

**12.** It will be noted that counsel made no reference to any claim of want of jurisdiction over the cause in their statement of the issues on which they wished to reserve the right to object.

(2) What percentage of the fees retained by each local union defendant is attributable to permissible expenditures, as outlined by previous order of this court.

*Id.* at 2–3. The special master was also directed to make these additional findings in connection with future injunctive relief:

(1) Do the unions' current recordkeeping policies in any way alter the factual findings previously submitted to the court?

(2) If so, what method of computation would most accurately reflect the percentage of fees collected which are properly allocable to permissible activities?

(3) In what manner, if at all, may this computation procedure be made self-executing in order to compensate for future changes in union policies?

(4) How should the final injunction be framed in order to accomplish the objection (sic) set forth in this order and the prior orders in this action? *Id.* at 3.

After taking additional testimony, 'the special master filed his supplemental report in September, 1981. In this report he proceeded to answer the specific questions addressed to him by the district court. He found, in response to the first two questions posed relating to the liability of the local unions, that his "calculations of applicable percentages of permissible and impermissible expenditures by CWA [were] applicable to and control the expenditures by the four Local Unions, i.e., Local 2100, Local 2101, Local 2108 and Local 2110, including, of course, the 60 percent of the fees in question retained by the Local Union Defendants." He added that "[t]his is *implicit* in the calculations appearing in Appendix F attached to the Original Report." The special master excused any lack of detail in his original report in this regard because of his desire to avoid unduly expanding his report, "especially when the Special Master concluded that the same deficiencies in meeting the required burden of proof to

establish expenditures made for the three permissible categories—collective bargaining, contract administration and grievance adjustment—applicable to the CWA expenditures were also applicable to the Local Union expenditures." He found that, "giving the locals the benefit of every doubt," he could not find that more than 19 percent of the locals' share of the exacted fees were used for permissible purposes under the guidelines earlier stated by the district judge. In response to the other questions with which he was directed to report, he found that the unions' current record-keeping policies did not in any way alter his previous factual findings. He found that the new system proposed by the unions for future allocation of permissible costs, as reviewed in the testimony, was "generally sufficient, prima facie to enable CWA to meet its burden of proof [i.e., by the standard of "clear and convincing" proof]," provided certain defects and omissions, detailed by the special master, were corrected or supplied. He concluded, however, that the system of calculation could not be made self-executing and would require periodic monitoring.

CWA and the local unions filed exceptions to the initial report and the supplemental report of the special master. In general, the objections of both the national and the local unions present the same contentions. The objections to the special master's findings of fact are stated in broad language and are incorporated in two general claims: First, they claim "[t]he categories of rebatable expenditures [by defendants as found by the special master] are too broad in that they give plaintiffs credit for CWA expenditures in addition to those for political and ideological activities unrelated to collective bargaining";[13] and second, the special master placed the burden of proof by "clear and convincing evidence" on the unions to establish the retainable portion of the agency fees paid by dissenting employees and drew inferences

---

**13.** The exceptions do not identify specifically any expenditures which were improperly disallowed except those relating to "organizing."

adverse to the unions for their failure to produce records.

Plaintiffs also filed objections to the special master's reports. In effect, they objected broadly that the special master had been too generous in its allowance of permissible expenditures by the unions against the claims of plaintiffs. They also found objectionable the conditional approval expressed by the special master of the union's proposed procedure for determining the amount of plaintiffs' agency fees to be refunded. Finally, they took exception to the special master's recommendation that plaintiffs "bear 19% of the costs of proceedings in which they are the prevailing parties."

On March 5, 1982, while the district judge was considering the objections of the parties to the special master's initial and supplemental reports, the unions petitioned for leave to file a Fed.R.Civ.P. 12(b)(6) motion for dismissal on the ground "that plaintiffs' complaint fails to state a claim upon which relief can be granted." In their memorandum in support of their motion, the unions referred to both plaintiffs' First Amendment cause of action and their claim that the unions' violated their duty of fair representation as set forth in plaintiffs' "Second Claim for Relief" appearing "in paragraphs 26, 27, and 28" of the complaint. Their position on the constitutional claim was that there was an absence of governmental action, which is a prerequisite for a justiciable First Amendment claim. They would fault the claim of a violation of the duty of fair representation because the agency shop is specifically authorized by statute, thereby validating the collection by the unions of the agency fees from dissenting non-union employees such as plaintiffs and that *after collection, the unions have "a due process right to spend the funds in any manner [they choose]."* (emphasis added)

The district court dismissed *sub silentio* defendants' 12(b)(6) motion and proceeded to sustain substantially the special master's recommendation with but slight variations. The court first corrected a mathematical error made by the special master, thereby increasing to 21 percent the amount properly chargeable to the agency fee payor plaintiffs. *Beck v. Communications Workers*, No. M–76–839, slip op. at 12–13 (D.Md. Aug. 9, 1983) (memorandum and order). Furthermore, the court modified the special master's recommended injunction by ordering CWA, after collecting 100 percent of the agency fees, to return to plaintiffs that percentage of such fees determined by an independent certified public accountant to be non-retainable as attributable to expenditures unrelated to collective bargaining, contract administration, and grievance adjustment. *Beck v. Communications Workers*, No. M–76–839, slip op. at 2–3 (D.Md. Aug. 9, 1983) (judgment). The district court also ordered CWA to maintain, for each fiscal year, an interest-bearing escrow account containing twice the amount determined in the previous fiscal year to be non-retainable. *Id.* at 3. In addition, the injunction provided that only if plaintiffs successfully challenged the amount determined to be non-retainable would CWA bear the cost of such challenge. *Id.* at 3–4. This appeal followed with both plaintiffs and defendants excepting to the rulings and conclusions of district court. We address first the exceptions of defendants.

After six years of litigation, 4,000 pages of testimony, the introduction of over 3,000 documents, and innumerable hearings and adjudication of motions, defendants, in their brief in this court, limit themselves to two claims of error, the first of which raises a question of a federal justiciable claim not advanced by defendants until they filed their motion for judgment under Rule 12(b)(6) made only after all evidence had been received and after the cause was ripe for disposition on the merits.[14] Their

---

**14.** While the lateness of this claim may not be a bar to its consideration, nonetheless the failure of defendants to raise such contention until after all evidence had been taken and after

defendants had consistently in the protracted proceedings acted on the assumption that there was jurisdiction of the subject matter is conduct not to be commended. Such delay places an

other claim of error relates to the standard of proof to be used in resolving plaintiffs' claim for a refund. The first claim of error by defendants to which defendants devoted almost eighty percent of their initial brief in this court, is directed at plaintiffs' claim that the collection and use of fees exacted of them by defendant unions under the authority of the agency fee agreement, for purposes other than those "germane to collective bargaining," are violative of plaintiffs' free speech and association rights under the First Amendment and their due process rights under the Fifth Amendment. Jurisdiction of such a constitutional action, plaintiffs opined, existed under 28 U.S.C. § 1331. Defendants, on this appeal, contest that position. It should be emphasized at the outset that in raising this belated jurisdictional claim defendants do not dispute the factual base for plaintiffs' constitutional claim. The district judge found, within a few months after this action was begun—on showings largely made by defendants themselves—that:

> In this case it is undisputed that the defendant union, CWA, has negotiated an 'agency shop' clause with the plaintiffs' employers which allows the union to collect dues-equivalent payments from the plaintiffs.... It is also clear that the plaintiffs object to the expenditure of their funds for purposes other than 'collective bargaining, contract administration, and grievance adjustment.' Finally, it is undisputed that CWA has spent and continues to spend an as yet undetermined fraction of its dues receipts and dues-equivalent agency receipts for purposes other than the three enumerated ones.[15]

Defendants have never contested those findings.

The legal basis asserted by defendants for this claim of lack of jurisdiction in the federal courts over the constitutional claim of plaintiffs is, to quote defendants' statement of their position in their brief, that "the plaintiffs' First Amendment claims fail because the defendant unions' negotiation of a union security clause valid under the National Labor Relations Act, as amended, and under applicable state law and the unions' expenditure of agency fees collected under such a clause is not state action subject to constitutional constraints." Brief for Appellants at 14. They concluded this statement of their position with: "If our position in this regard is accepted, the judgment of the district court should be reversed and the plaintiffs' constitutional claims should be dismissed." Id.

It would seem fair to assume from this statement of their position by defendants that, in their view, plaintiffs' case is restricted to a constitutional claim, and if the constitutional cause of action fails for lack of jurisdiction, plaintiffs are without a federal judicial remedy. This assumption is further indicated by the failure of defendants in their initial brief even to notice or discuss plaintiffs' statutory claim. We take it that defendants posited that, since in their view the ruling of the district judge rested on constitutional grounds, the federal jurisdictional basis for judgment herein must stand or fall on whether jurisdiction can be sustained over plaintiffs' constitutional claim.

■ It is, however, a settled rule of appellate procedure "that a decision of the district court is not to be reversed if it has reached the correct result, even though the reason assigned by it may not be sustained." See *Stern v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 603 F.2d

intolerable burden on orderly and efficient judicial administration. They had earlier raised other defenses, all in vain, and CWA had actually offered on two occasions to rebate all collections of dues from dissenting non-union employees. The defense offered by defendants for their delay is that they did not raise the jurisdictional claim in 1979 because the jurisdictional ruling was unexpected. This excuse might have

some credibility if defendants had acted promptly but to delay for years to raise the point undercuts the reasonableness of the excuse.

**15.** *Beck v. Communications Workers*, 468 F.Supp. 93, 96–97 (D.Md.1979).

1073, 1093 (4th Cir.1979). The complaint herein states in separate counts not merely a cause of action charging a violation of the First Amendment in the compelled payment of the dues-equivalent under threat of loss of job, but also a cause of action under section 8(a)(3) of the NLRA as construed by the Supreme Court, and related thereto, a violation by defendants of their duty of fair representation. Only if jurisdiction of these claims under section 8(a)(3) itself is non-existent would a dismissal of this action for lack of jurisdiction be appropriate. Nor would this result be different because the district court may have decided jurisdiction on the assumption that plaintiffs' action was based on the unconstitutionality of the compelled payments. If the judgment can be sustained because of jurisdiction over either the constitutional or the statutory claim of plaintiffs, the judgment will be sustained, though, as we later observe, courts prefer to decide the issue by a construction of the statute if confrontation of the constitutional issue can thus be avoided. That this is the accepted practice is illustrated by the decision of the Supreme Court in *International Association of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). That case, which involved similar constitutional and statutory issues to those posed here under a similar statute and agency contract, was decided in the state court on constitutional grounds. On appeal, plaintiffs apparently pressed the constitutional claim. The Supreme Court, however, decided the case on statutory grounds, thereby avoiding review of the constitutional issue.

In their reply brief in this court, it is accordingly understandable that defendants chose not to persevere in their argument that the judgment herein must be reversed if the constitutional claim of defendants is not accepted, and defendants recognized the necessity of addressing the statutory claim, the maintenance of which did not require "state action." Since it seems clear to us that plaintiffs have stated a good cause of action for a violation of

section 8(a)(3) of the NLRA redressable under 28 U.S.C. § 1337 and 29 U.S.C. § 185(a), as well as a claim of a violation of the duty of fair representation justiciable under 28 U.S.C. § 1331 and 29 U.S.C. § 185(a), we shall deal with this question before addressing the right of plaintiffs to maintain a constitutional claim on the same facts. We begin by considering both the language of and the legislative purpose of section 8(a)(3) of the NLRA, which provides the basis for plaintiffs' statutory claim.

Section 8(a)(3), added to the NLRA by the Labor-Management Relations Act of 1947 (Taft-Hartley Act),[16] provides permissive authority for an agreement between an employer and the exclusive union bargaining representative, selected in conformity with the terms of the NLRA, whereby employees are required to have union "membership" as a condition of employment, subject however, to the express condition that no employer could discharge an employee "for nonmembership in a labor organization ... if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership." 29 U.S.C. § 158(a)(3) (1983). The legislative purpose of section 8(a)(3), as evidenced in the legislative record, was twofold: First, Congress intended the elimination of the closed shop and the substitution of the union or agency shop; second, in response to the plea of the unions that the existing statute encouraged "free riders," employees who enjoyed the benefits of collective bargaining but shared none of the costs of the bargaining process, it included the "membership" provision or requirement. *See* S.Rep. No. 105, 80th Cong., 1st Sess. 6–7 (1947); Legislative History of the Labor-Management Relations Act, 1947, at 413, 1422 (1948) (statements of Senator Taft); *Oil, Chemical & Atomic Workers International Union v. Mobil Oil Corp.,* 426 U.S. 407, 426, 96 S.Ct. 2140, 2149, 48

---

**16.** Act of June 23, 1947, ch. 120, Title I, § 101,  61 stat. 136, 140–141.

L.Ed.2d 736 (1976) (Stewart, J., dissenting); *NLRB v. General Motors Corp.*, 373 U.S. 734, 740–41, 83 S.Ct. 1453, 1458–59, 10 L.Ed.2d 670 (1963).

However, the "membership" requirement was quickly "whittled down to its financial core," because the Supreme Court found that "[t]his legislative history [of the statute] clearly indicates that Congress intended to prevent utilization of union security agreements for any purpose other than to compel payment of union dues and fees." *NLRB v. General Motors Corp.*, 373 U.S. at 742, 83 S.Ct. at 1459 (quoting *Radio Officers' Union v. NLRB*, 347 U.S. 17, 41, 74 S.Ct. 323, 336, 98 L.Ed.2d 455 (1954)). Accordingly, "[i]f an employee in a union shop unit refuses to respect any union-imposed obligations other than the duty to pay dues and fees, and membership in the union is therefore denied or terminated, the condition of 'membership' for § 8(a)(3) purposes is nevertheless satisfied and the employee may not be discharged for nonmembership even though he is not a formal member." *NLRB v. General Motors Corp.*, 373 U.S. at 743, 83 S.Ct. at 1459–60.[17] Thus, the extent of the objecting employee's obligation under the union or agency contract is the payment of dues, and the legislative history reveals that the obligation to pay dues was, it would seem, directly related to the costs of the collective bargaining itself.[18]

Prior to 1950, railroad workers, on the other hand, had been denied the right to have a union or agency shop. They sought similar rights to those enjoyed by employees in other industrial fields under section 8(a)(3). Congress responded to this demand by enacting section 2, Eleventh of the Railway Labor Act (RLA).[19] Evident of its intention merely to give railway workers similar rights to those of other workers under section 8(a)(3), "Congress [in phrasing section 2, Eleventh] simply tracked the language of Section 8(a)(3) of the Taft-Hartley Act." T. Haggard, *Compulsory Unionism, The NLRB And The Courts* 115 (1977). Further, the legislative record is replete with responsible representations that the intent was to confer on railway workers simply the same rights other workers had under section 8(a)(3). *Id.* at 127. Senator Hill, the manager of the bill in the Senate, assured the Senate that the intention of section 2, Eleventh was "merely to extend to employees and employers subject to the Railway Labor Act rights now possessed by employees and employers under the Taft-Hartley Act in industry generally." 96 Cong.Rec. 15,737 (1950).. Senator Taft, the co-author of section 8(a)(3), was equally explicit. He declared during debate that section 2, Eleventh "inserts in the railway mediation law almost the exact provisions ... of the Taft-Hartley law, so that the conditions regarding the union shop and the check-off are carried into the relations between railroad unions and railroads." 96 Cong.Rec. 16,267 (1950). *See also* S.Rep. No. 2262, 81st Cong., 2d Sess. 3, 5 (1950); H.R.Rep. No. 2811, 81st Cong., 2d Sess. 405 (1950).

As is obvious, it would be difficult, if not impossible, to find two statutes more identical in language and legislative purpose than section 8(a)(3) of the NLRA and section 2, Eleventh ᴏf the RLA.[20] It is incon-

---

**17.** This follows the comments of Representative Klein that while the statute purports to allow a union shop, the practical effect of the statute's insulation of ousted members against being fired by the employer so long as dues were paid was to "allow only a requirement that dues be paid." Legislative History of the Labor-Management Relations Act, 1947, at 655 (1948).

**18.** Professor Cantor in his article, *Uses and Abuses of the Agency Shop, supra* note 2, at 75 n 64 recognizes this:

"Where Congress has authorized compulsory extraction of a fee from workers in a represented unit, the monies must be spent in

a manner consistent with the purpose for which the fee is extracted, effective representation of workers."

**19.** Act of Jan. 10, 1951, ch. 1220, 64 stat. 1238–39, codified at 45 U.S.C. § 152, Eleventh (1983).

**20.** It is true there are differences between the RLA and the NLRA, and where there is "difference in the language and scheme of the two statutes" there will be differences in the application of the provisions of such Acts. *See Ruby v. American Airlines, Inc.*, 323 F.2d 248, 256 (2d Cir.1963), *cert. denied,* 376 U.S. 913, 84 S.Ct.

ceivable that two such statutes would be construed differently. For this reason it seems fair to assume that the construction given one by the Supreme Court would be equally applicable to the other, and we proceed on that basis in construing section 8(a)(3).

The first consideration of either of these statutes by the Supreme Court was in *Railway Employes' Department v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed.2d 1112 (1956). In that case, which involved a charge of unconstitutionality against section 2, Eleventh under the First Amendment free speech and association clause and the due process clause of the Fifth Amendment, the Court found the statute, which authorizes the collection of a dues-equivalent from non-union, objecting employees by an exclusive bargaining representative of the employees, valid so far as the unions' use of the fees was for purposes "germane to collective bargaining" *Id.* at 235, 76 S.Ct. at 720. The Court reserved ruling on the permissibility of the collection of the dues-equivalent from objecting employees "for purposes not germane to collective bargaining," though it was the clear implication of the decision that such use would be unconstitutional. *Id.* at 238, 76 S.Ct. at 721.

Five years later in *International Association of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), the Supreme Court was directly confronted with the question whether a union, acting as the exclusive bargaining representative under an agency contract as authorized under section 2, Eleventh, could constitutionally collect and use the dues-equivalent exacted from an objecting employee in the unit for "political purposes." The result of sustaining this argument would have been a decision rendering the statute unconstitutional. The Court found it unnecessary,

though, to consider the constitutionality of the union's collection and use of the dues-equivalent under the statute because it held that it was "not only 'fairly possible' but entirely reasonable" to construe the statute itself in a way making it unnecessary to consider the statute's constitutionality. *Id.* at 750, 81 S.Ct. at 1790. In adopting this procedure, the Court was merely following a rule often applied and recently restated in *Ellis v. Brotherhood of Railway, Airline and Steamship Clerks,* 466 U.S. 435, ——, 104 S.Ct. 1883, 1889–90, 80 L.Ed.2d 428, 439 (1984): "When the constitutionality of a statute is challenged, this Court first ascertains whether the statute can be reasonably construed to avoid the constitutional difficulty." The Court, accordingly, looked to the legislative purpose of section 2, Eleventh. *See United States v. Security Industrial Bank,* 459 U.S. 70, 82 n. 12, 103 S.Ct. 407, 414 n. 12, 74 L.Ed.2d 235 (1982); *Buckley v. Valeo,* 424 U.S. 1, 79 n. 106, 96 S.Ct. 612, 663 n. 106, 46 L.Ed.2d 659 (1976); *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). Based on its finding of the statute's legislative purpose, the Supreme Court held that, under section 2, Eleventh, unions were not vested with "unlimited power to spend exacted money" and they might not use such money to "support candidates for public office" or to "advance political programs" because those were not uses which help "defray the expenses of the negotiation or administration of collective agreements, or the expenses entailed in the adjustment of grievances and disputes." *Street,* 367 U.S. at 768, 81 S.Ct. at 1800.[21] The Court, however, limited its decisions to the union's "power to use [the dissenting employee's] funds to support political causes which he opposes," saying:

> We express no view as to other union expenditures objected to by an employee

658, 11 L.Ed.2d 611 (1964). This is not such a case. There is like statutory language and like legislative purpose here and, therefore, like statutory construction.

**21.** In *Ellis,* 466 U.S. at ——, 104 S.Ct. 1887, 80 L.Ed.2d at 436, the Supreme Court said that

*Street* held that the RLA "does not authorize a union to spend an objecting employee's money to support political causes. The use of employee funds for such ends is unrelated to Congress' desire to eliminate 'free riders' and the resentment they provoked."

and not made to meet the costs of negotiation and administration of collective agreements, or the adjustment and settlement of grievances and disputes. *Id.* at 769 [81 S.Ct. at 1800].

This construction of section 2, Eleventh, as stated in *Street,* was restated in *Brotherhood of Railway and Steamship Clerks v. Allen,* 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963). In that case the Supreme Court said:

> Respondents' amended complaint alleges that sums exacted under the Agreement 'have been and are and will be regularly and continually used by the defendant Unions to carry on, finance and pay for political activities directly at cross-purposes with the free will and choice of the plaintiffs.' *This allegation sufficiently states a cause of action.* It would be impracticable to require a dissenting employee to allege and prove each distinct union political expenditure to which he objects; it is enough that he manifests his opposition to *any* political expenditures by the union. *Id.* at 118, 83 S.Ct. at 1162 (emphasis added).

In *Ellis,* the Supreme Court followed *Street* and *Allen* in their statement of the principle that a statute challenged for unconstitutionality under the First Amendment may be sustained if, as a result of a reasonable narrowing construction consonant with the legislative purpose reflected in the statute, the constitutional objection may be removed or obviated. It found, as had the Court in the earlier cases, that the statute could reasonably be given such construction, and it proceeded to hold that expenditures from the dues-equivalent collected from objecting employees under an agency contract authorized by section 2, Eleventh could embrace expenditures "necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues. Under this standard, objecting employees may be compelled to pay their fair share of not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed *to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit.*" 466 U.S. at ——, 104 S.Ct. at 1892, 80 L.Ed.2d at 442 (emphasis added). The Court then went beyond the holdings of its previous decisions, which had limited its interdiction of the use of the dues-equivalent to expenditures for "political activities" or "political expenditures" (*Allen,* 373 U.S. at 118–19, 83 S.Ct. at 1161–62), or "for the expression of political views, on behalf of political candidates, or towards the advancement of other ideological causes not germane to its duties as collective-bargaining representative" (*Abood,* 431 U.S. at 235, 97 S.Ct. at 1800), or "for forcing ideological conformity or other action in contravention of the First Amendment," (*Hanson,* 351 U.S. at 238, 76 S.Ct. at 721) or "to use [of the employee's] money to support political causes which he opposes" (*Street,* 367 U.S. at 768, 81 S.Ct. at 1800). Instead, the Court proceeded to identify more specifically certain expenditures which would be permissible and some which would not be permissible under the standards declared by the Court in the construction of section 2, Eleventh. Costs of national conventions, "refreshments for union business meetings and occasional social activities," publications "reporting [to employees] about those activities it can charge them for doing," and "litigation incident to negotiating and administering the contract or to settling grievances and disputes" were said to be permissible charges that could be legitimately made on a proportionate basis against objecting employees but not "organizing" expenditures, which are "outside Congress' authorization." 466 U.S. at ——–——, 104 S.Ct. at 1892–95, 80 L.Ed.2d at 442–45.

In the midst of its decisions construing section 2, Eleventh of the RLA, the Supreme Court dealt in *Abood v. Detroit Board of Education,* 431 U.S. 209, 223, 97 S.Ct. 1782, 1793, 52 L.Ed.2d 261 (1977), with a state statute which authorized an

agency shop under "a regulatory scheme which, although not identical in every respect to the NLRA or the Railway Labor Act, [was] broadly modeled after federal law." Accordingly, for guidance in construing that state statute "modeled" after section 8(a)(3) of the NLRA and section 2, Eleventh of the RLA, the Supreme Court looked to the decisions in *Hanson* and *Street* under section 2, Eleventh. *Id.* at 225, 97 S.Ct. at 1794. It observed that "insofar as the service charge is used to finance expenditures by the Union for the purposes of collective bargaining, contract administration, and grievance adjustment, those two decisions of this Court appear to require validation of the agency-shop agreement before us." *Id.* at 225–26, 97 S.Ct. at 1794–95. But Michigan law also "permit[ed] union expenditures [by the union under the agency shop agreement] for legislative lobbying and in support of political candidates." *Id.* at 215, 97 S.Ct. at 1789. The Supreme Court invalidated on First Amendment grounds the Michigan statutory authorization for the use of fees collected from an objecting employee for such purposes, saying:

> We do not hold that a union cannot constitutionally spend funds for the expression of political views, on behalf of political candidates, or toward the advancement of other ideological causes not germane to its duties as collective-bargaining representative. Rather, the Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment. *Id.* at 235–36 [97 S.Ct. at 1799–1800].[22]

It is defendants' position, though, that the construction of section 2, Eleventh as first stated in *Street* and later reiterated in *Allen* and *Ellis*, is inapplicable in the construction of section 8(a)(3), despite their similarity in language and purpose, and

despite the use of those cases, in construing a similar Michigan statute in *Abood*. In its discussion of the statute in *Abood*, the Court likened that statute to section 8(a)(3) and section 2, Eleventh and then said that the Michigan statute was to be construed as those two federal statutes had been construed in *Hanson* and *Street*. It is difficult, therefore, to see the force of an argument that *Street*, *Allen*, and *Ellis* are not as relevant to the construction of section 8(a)(3) as they are to the construction of section 2, Eleventh. If those decisions were relevant to the construction of the state statute in *Abood*, they are even more relevant in construing a like federal statute.

And defendants appear to have conceded as much in their formal presentation of their position to the district court in the letter of their counsel. In his letter of June 3, 1977, defendants' counsel advised the district court on the position of defendants thus: "The principal opinion's discussion [in *Abood*] of national labor policy and decisions under the National Labor Relations Act would seem to indicate that the principles of *Hanson* and *Street* interpreting the Railway Labor Act apply equally to non-railway employees." Moreover, one commentator suggested, even in advance of *Abood*:

> It is unlikely that the first amendment issue raised by political expenditures of forced contributions under the union's security agreements will be resolved in the private sector. The issue under the RLA has been mooted by *Street*, and the NLRA, which governs most other private employers, contains language authorizing union security agreements that is almost identical to that in the RLA. Since the Supreme Court interpreted the RLA as prohibiting political expenditures, it would be almost certain to place

---

**22.** For a full critique of *Abood, see generally The Supreme Court, 1976 Term,* 91 Harv.L.Rev 1, 158–198 (1977).

a similar interpretation on that language in the NLRA.[23]

Even Professor Cantor, who is the most public critic of the limited use of union dues under an agency contract, supports this view. In his latest article, *Forced Payments to Service Institutions and Constitutional Interests in Ideological Non-Association*, 36 Rutgers L.Rev. 3,41 n. 219 (1984), he states:

Although *Street* dealt only with RLA authorizations of a union shop, the NLRA provision contains virtually identical constraints. [citations omitted] RLA § 2(11), adopted in 1951, was simply intended to confer on rail unions the same union security prerogatives conferred on industrial unions in 1947 in the Taft-Hartley Act. [citations omitted] Thus, legislative history under both the RLA and the Taft-Hartley Act is relevant to assessing congressional intent in shaping the permissible bounds of union security provisions.

In Henkel & Wood, *Limitations on the Uses of Union Shop Funds After Ellis: What Activities are "Germane" to Collective Bargaining?* 35 Lab.L.J. 736, 743 (1984), the latest academic comment on the two statutes, the authors said:

Second, it is apparent that *Ellis* will apply to claims brought under the NLRA. As noted in *Ellis*, Congress's purpose in allowing the union shop was to eliminate the free-rider problem, which arose from exclusive union representation. Congress favored exclusive union representation as a means of promoting labor peace. This notion of exclusive union representation 'underlies the National Labor Relations Act as well as the Railway Labor Act.' For this reason the policies behind the *Ellis* standard are just as applicable under the NLRA. The Ninth Circuit dealt with this issue in *Seay* [*Seay v. McDonnell Douglas Corp.*, 427 F.2d 996, 1003 (9th Cir.1970) ]. In that case the court noted: 'Both the applicable provisions of the Act [RLA] 45 U.S.C. [§ 152, Eleventh—and the applicable provision of the National Labor Relations Act—29 U.S.C. § 158(a)(3)—] are for all purposes here, the same.' It appears, therefore, that the scope of *Ellis* will extend to cases under the NLRA.

We conclude, therefore, that the two statutes, (i.e., section 2, Eleventh and section 8(a)(3)) phrased similarly and expressive of the same legislative purpose, should be given the same construction. The defendants appear to argue, though, that the Supreme Court in *Street, Allen,* and *Ellis* in its construction of section 2, Eleventh was so motivated by a desire to avoid finding the statute under review unconstitutional that it gave the statute a skewed or "tortured" construction. They posit that the same "grave" constitutional question perceived by the Supreme Court to exist in connection with the construction of section 2, Eleventh did not exist in connection with the construction of section 8(a)(3). It followed under the defendants' syllogism that, in their view, *Street, Allen,* and *Ellis* were not to be given weight in construing section 8(a)(3). We do not find either of the grounds for this syllogism of the defendants valid. First of all, we disagree that the Supreme Court gave section 2, Eleventh an "unreasonable" or skewed construction in order to avoid confronting the constitutional issue. In construing section 2, Eleventh, the Supreme Court in *Street* carefully canvassed the legislative record in order to ascertain the legislative purpose of the statute and, on the basis of that examination of legislative purpose, it reached what in its considered opinion was an "entirely reasonable" construction of the statute. 367 U.S. at 750, 81 S.Ct. at 1790. In view of the strength of this construction ("entirely reasonable"), we are not prepared to find the construction given section 2, Eleventh by Justice Brennan in *Street* to be "tortured," to use Professor Cantor's term. Cantor, *supra* note 2, at 72. We would be properly hesitant to brand a construction of a statute adopted by the Supreme Court in three cases to be "skewed"; we believe the construction adopted by the Supreme Court was, as that

---

**23.** Blair, *Union Security Agreements in Public Employment,* 60 Cornell L.Rev. 183, 194 (1975).

Court said, one which was the "entirely reasonable" construction of the statute based on both its language and its legislative history.

Defendants' second reason, as included in their syllogism, seems to be, however, that the Supreme Court could not be expected to nor would it be impelled to give section 8(a)(3), in an action involving that section, the same construction it had given section 2, Eleventh, in an action involving only that statute, because the Court would not have been confronted with the same "grave" constitutional question in the case of a challenge to section 8(a)(3) as it was when section 2, Eleventh was challenged. The rationale for this position is said by defendants to be that section 2, Eleventh explicitly pre-empted all contrary state law whereas section 8(a)(3) is inapplicable in any state which has enacted a right-to-work law under section 14(b) of the Taft-Hartley Act.[24] We are unable to see the force of this argument when the question arises in a state such as Maryland which has no right-to-work law and to which section 14(b) has no application. So far as this case is concerned, arising as it does in Maryland, there is no difference between a section 8(a)(3) constitutional challenge and the section 2, Eleventh challenge in *Street*. Section 8(a)(3) is just as effective and all-inclusive so far as employees in Maryland covered by the NLRA are concerned, as section 2, Eleventh is with respect to railway employees employed in Maryland. In fact, the purpose of enacting section 14(b) was to prevent pre-emption of state law in those states which should exercise the right given them by section 14(b) to be exempt from the authorization of section 8(a)(3). *Oil, Chemical & Atomic Workers International Union v. Mobil Oil Corp.*, 426 U.S. at 417, 96 S.Ct. at 2145. When the employees in Maryland, whether employed on the railroad or in other industrial installations have no rights secured under section 14(b) of the NLRA and are subject to practically identical statutory restrictions and limitations under section 8(a)(3) and

section 2, Eleventh, it seems inconceivable that the Supreme Court would, in construing the two statutes, offer protection to one group of such employees and deny it to others because of some action taken by another state in enacting a statute under section 14(b) to protect only that latter state's employees. Actually, it is interesting that in *Abood*, where the Supreme Court faced the constitutionality of the agency shop clause directly, because the Michigan statute addressed public employees, it adopted the very construction of section 2, Eleventh declared by it in *Street* as the limit of constitutional power in permitting the exaction of the dues-equivalent from an objecting employee under an agency contract executed by an exclusive bargaining representative under the authority of a state or federal statute. This, it seems to us, demonstrates that it matters not under what statute the claim arises, for the result is the same.

Defendants also seek to cite other differences between section 2, Eleventh and section 8(a)(3) which render it improper to construe the two statutes similarly. The first of these differences is that prior to the enactment of section 2, Eleventh, the RLA prohibited the union shop whereas section 8(a)(3) of the NLRA permitted the union shop prior to the amendment made to that section in 1947 by the Taft-Hartley Act. It escapes us how the language of the two Acts prior to the additions of the provisions in question could effect the construction to be given the later amendments, expressed in similar language and intended to effectuate the same legislative purpose. Next, defendants find substantial differences because section 2, Eleventh allows union shop charges "for periodic dues, initiation fees, and assessments" and section 8(a)(3) uses the language "periodic dues and the initiation fees." When we consider the definition which the Supreme Court gave the term "assessment" in section 2, Eleventh of the Railway Labor Act, we perceive no reason to make any distinction between the two Acts so far as the issue

**24.** 29 U.S.C. § 164(b) (1983).

involved in this case is concerned. Thus, in *Hanson*, the Court clearly stated that "[i]f 'assessments' are in fact imposed for purposes not germane to collective bargaining," they would be subject to the same restraints on use as would "dues." 351 U.S. at 235, 76 S.Ct. at 720. In short, "assessments" add nothing to "dues" so far as an ability of the union to use either for "purposes not germane to collective bargaining." Finally, defendants find some significance in the fact that, during the development of section 8(a)(3), there was some discussion of placing a limit on "dues" or "initiation fees," but Congress determined ultimately not to do so, whereas in the later adoption of section 2, Eleventh the legislative history is silent on this point. The fact that in the legislative history of the earlier statute (section 8(a)(3)) there had been discussion of placing a dues limit in the statute, but Congress ultimately determined not to include or limit, whereas Congress, during the discussion preceding the later enactment of section 2, Eleventh never mentioned the subject of a limit on dues but followed the earlier statute in omitting such a limit, lacks any logical meaning to us. The addition of a specific limit on "dues" in the statute had been resolved when section 8(a)(3) was adopted. Unless Congress wished to depart from its view as adopted in 1947 in the consideration of section 8(a)(3), there was no point in reopening the matter when later Congress was considering enacting a similar statute for railway workers in section 2, Eleventh.

As their final thrust at the statutory claim of plaintiffs, defendants assert that plaintiffs' action, if sustainable, is within the exclusive jurisdiction of the National Labor Relations Board and that plaintiffs are without any justiciable remedy for the redress of this violation of their rights. Defendants conceded in their affidavits and motions, however, that a portion of the dues collected from plaintiffs by them was and will be used to finance political activities. The conscious use of such funds by the unions on their authority as the exclusive bargaining representative under the agency contract negotiated by them with the employer is not only a violation of the statute itself but also a violation of defendants' duty of fair representation. In either case, the action would have been within the jurisdiction of the district court under 28 U.S.C. § 1337. In *Street*, the Supreme Court made it clear that under the federal labor law "a union's status as exclusive bargaining representative carries with it the duty fairly and equitably to represent all employees of the craft or class, union and nonunion." 367 U.S. at 761, 81 S.Ct. at 1796. And this duty has been interpreted "to require a union to represent fairly all the members of the bargaining unit for which the union is the exclusive agent, and this obligation in turn has been interpreted to include a specific duty to the unit's nonunion employees to establish procedures that will make sure that the employees are not forced to pay for union activities other than those the union undertakes in its agency role." *Hudson v. Chicago Teachers Union Local No. 1*, 743 F.2d 1187, 1191 (7th Cir.1984).

Specifically, courts have held that the union, under its role of exclusive bargaining representative by virtue of the agency contract, violates this duty of fair representation by compelling payments of dues to be used for purposes "not germane to collective bargaining" unless the unions have established a rebate procedure that fully protects the nonassenting employees from illegal exactions. That defendants in this case have not established a rebate procedure that "adequately protected the nonmembers' right to avoid contributing to objectionable political purposes" is established by *Ellis*. *Champion v. California*, 738 F.2d 1082, 1086 (9th Cir.1984), *cert. denied sub nom. Champion v. Deukmejian*, —— U.S. ——, 105 S.Ct. 1230, 84 L.Ed.2d 367 (1985) (decided on the basis of *Ellis*). Under those circumstances, an action for violation of the duty of fair representation is not pre-empted by the National Labor Relations Act, for, as the Supreme Court said in *Amalgamated Association of Street, Electric Railway & Motor Coach*

*Employees v. Lockridge,* 403 U.S. 274, 299, 91 S.Ct. 1909, 1924, 29 L.Ed.2d 473 (1971):

> Indeed, in *Vaca v. Sipes,* 386 U.S. 171 [87 S.Ct. 903, 17 L.Ed.2d 842] (1967), we held that an action seeking damages for injury inflicted by a breach of a union's duty of fair representation was judicially cognizable in any event, that is, even if the conduct complained of was arguably protected or prohibited by the National Labor Relations Act and whether or not the lawsuit was bottomed on a collective agreement.

This same thought was expressed in *Smith v. Local No. 25, Sheet Metal Workers International Association,* 500 F.2d 741, 746 (5th Cir.1974):

> In our judgment, union conduct may be consistent with or even unrelated to the terms of a collective bargaining agreement and yet violative of the duty of fair representation.

Such was the ruling in *Seay v. McDonnell Douglas Corp.,* 427 F.2d 996, 1000 (9th Cir.1970), and *Reid v. McDonnell Douglas Corp.,* 443 F.2d 408, 411–12 (10th Cir. 1971).[25]

Jurisdiction over plaintiffs' statutory suit against defendant union under section 8(a)(3) and for breach of the duty of fair representation was properly invoked under 28 U.S.C. § 1337. Section 1337 provides, in pertinent part, that "[t]he district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce." The Supreme Court has held that the NLRA is an Act of Congress regulating commerce, *see Capital Services, Inc. v. NLRB,* 347 U.S. 501, 504, 74 S.Ct. 699, 701–02, 98 L.Ed.

887 (1954), and a suit for the protection of rights protected by section 8(a)(3) and under the union's duty of fair representation is one arising under the NLRA, *see William E. Arnold Co. v. Carpenters District Council,* 417 U.S. 12, 16, 94 S.Ct. 2069, 2072, 40 L.Ed.2d 620 (1974); *NLRB v. Heyman,* 541 F.2d 796, 799 (9th Cir.1976); *Anderson v. United Paperworkers International Union,* 641 F.2d 574, 576 (8th Cir. 1981); *Smith v. Local No. 25, Sheet Metal Workers International Association,* 500 F.2d 741, 748–49 (5th Cir.1974); *Nedd v. United Mine Workers,* 400 F.2d 103, 106 (3rd Cir.1968). *See also Storey v. Local 327, International Board of Teamsters,* 759 F.2d 517 (6th Cir.1985). In the case *sub judice,* plaintiffs pled jurisdiction under section 1337 and challenged CWA's expenditures both under section 8(a)(3) as construed by the Supreme Court and as violative of its duty of fair representation. Consequently, the district court properly exercised jurisdiction over this matter.[26] In addition, were this not so, it is difficult to find jurisdiction in *Ellis,* which was filed initially in the federal district court, just as this case. That case was exactly like this case, save that it was brought under section 2, Eleventh and this one under section 8(a)(3). But, as we have seen, the two statutes are to be construed alike and both give to objecting employees the same rights. If there was jurisdiction under section 1337 over a statutory claim under section 2, Eleventh in *Ellis* (and that could be the only basis for jurisdiction in *Ellis* since the Supreme Court found it unnecessary to consider the constitutional claim), by the same token there is jurisdiction over the

---

**25.** On remand, the court in *Reid* found that the union had given proper protection by its rebate provision and therefore held that the union had not violated its duty of fair representation. *Reid v. International Union,* 479 F.2d 517, 520 (10th Cir.1973). The correctness of this decision must be doubtful after *Ellis* in which the Supreme Court disapproved a similar rebate procedure.

**26.** Because jurisdiction was properly invoked under § 1337, we need not decide whether jurisdiction exists under § 301 of the Taft-Hartley Act, 29 U.S.C. § 185. However, in *Seay v.*

*McDonnell Douglas Corp.,* 427 F.2d 996, 1000 (9th Cir.1970), it was said that jurisdiction could be sustained under § 185 if the facts alleged or proved brought the action within the section. The undisputed facts in this case meet that test. *See Aguirre v. Automotive Teamsters,* 633 F.2d 168, 174 (9th Cir.1980) ("'If facts giving the court jurisdiction are set forth in the complaint, the provision conferring jurisdiction need not be specifically pleaded'") (quoting *Williams v. United States,* 405 F.2d 951, 954 (9th Cir.1969) ); *Fristoe v. Reynolds Metal Co.,* 615 F.2d 1209, 1212 (9th Cir.1980).

statutory claim under section 8(ₐ)(3) here. In short, jurisdiction can only be denied in this case if jurisdiction is to be denied in *Ellis.*

*Kolinske v. Lubbers,* 712 F.2d 471, 481–82 (D.C.Cir.1983), has been cited as contrary to jurisdiction in this case. *Kolinske,* on its facts, may well be said not to raise an issue within the union's duty of fair representation or violative of section 8(a)(3). The question there involved was the appellee's eligibility to receive strike benefits during a strike. These benefits were not created under the agency contract with the employer; neither did they have statutory authorization; they "were developed by the union *solely* as an ancillary, supportive tool of collective bargaining"; they by the terms of their creation "were made available to any employee, whether member or non-member, who contributed to the fund and in some way manifested a willingness to help the union's collective bargaining activities" (in this case the strike); and "[e]ligibility for benefits was conditioned in many ways, and payment was based on family size and length of a strike." *Id.* at 482 (emphasis added). The appellee's claim in that case related to the union's rules of eligibility for benefits from a union-developed and union-created fund. Such a case is one entirely involving union internal policies. In this case, however, the union's rights and obligations arise out of an agency contract authorized under a federal statute. Under that federally authorized contract, the union derives its right to collect a service charge from objecting employees. The rights of the union thus derive from an agreement, the content of which—so far as the collection of the dues-equivalent—is controlled by federal law as declared by the Supreme Court. The source of the union's authority in this case is not certain rules developed and set by the internal procedures of the union; its right to the service charge and its obligation in the use of the dues-equivalent collected for that purpose stem from an agency contract that exists only by virtue

of federal law. A violation by the union of its duties under such contract, is a clear breach of section 8(a)(3) and of the union's duty of fair representation, intended to protect against discriminatory or arbitrary action by the union.

Since we are satisfied that there is jurisdiction of the statutory action under section 1337 on the authority of *Street, Allen,* and *Ellis,* it would seem unnecessary for us to consider the constitutional basis for jurisdiction. Lest it be thought that we agree with defendants' contention that there is no such basis for jurisdiction in this case, we address briefly that issue. We add that we are convinced that there is governmental action sufficient to sustain jurisdiction. The Supreme Court found jurisdiction of the constitutional right of action under section 2, Eleventh in *Hanson,* which involved "private employment" as does this case. 351 U.S. at 232, 76 S.Ct. at 718. Further, the constitutional claim dealt with a statute which, as we have seen, was similar in language and legislative purpose to section 8(a)(3). As *Abood* emphasizes, "the union shop, as authorized by the Railway Labor Act, also was found to result from governmental action in *Hanson.* The plaintiffs' claims in *Hanson* failed, not because there was no governmental action, but because there was no First Amendment violation." 431 U.S. at 226, 97 S.Ct. at 1794–95. If we assume that section 2, Eleventh and section 8(a)(3) are to be given the same interpretation, then it necessarily follows under *Hanson* that there is governmental action here sufficient to satisfy the requirements for governmental action.[27] And defendants apparently recognize this, for they have argued at some length, as we have seen, that there is a substantive difference in the two statutes.

As we have said, no difference in the two statutes can be found either in their language or in their proclaimed legislative purpose. Defendants, however, purport to find a difference in the fact that section 14(b) of the NLRA applies to exclusive representation cases under the NLRA, and

---

**27.** *See* Blair, *supra* note 23, at 194.

not to such cases arising under the RLA. As we have said earlier, section 14(b) provides that section 8(a)(3) in its authorization of the agency shop will not apply in cases arising in a state which has banned agency shops. There is no similar provision in the RLA, for section 2, Eleventh states explicitly that it supersedes any state law. Repeating what we said earlier: we are unable to find that this difference has any relevance in the case before us. This action arises in Maryland, a State which has no right-to-work statute. So far as an agency shop under section 8(a)(3) in Maryland is concerned, it stands the same as the similar agency shop under section 2, Eleventh of the RLA. Section 14(b) applies in neither of those cases; the controlling law in both cases is the federal statute. The court in *Linscott v. Millers Falls Co.*, 440 F.2d 14, 17 (1st Cir.) *cert. denied*, 404 U.S. 872, 92 S.Ct. 77, 30 L.Ed.2d 116 (1971), put the matter accurately: "By section 14(b)'s necessary implication, federal approval, and hence federal enforcement [under section 8(a)(3)] will exist in those states that do not enact such a law."

Defendants purport to find some substance for their argument in what they declare is the permissiveness in section 8(a)(3). Whether there is an authorized agency shop under section 8(a)(3) in any state depends, they argue, upon the will of the state, which, by enacting a section 14(b) statute, can prevent the execution of a valid agency contract over employment in the state. Governmental action which can exist only by the permission of the state will not do, they declare. Defendants overlook that an agency contract, whether under section 2, Eleventh or under section 8(a)(3), is by definition permissive. It depends on the agreement of both the employer and the bargaining agent; unless both give their permission, there can be no agency contract under either statute. This is the reason Justice Douglas in *Hanson* said: "The union shop provision of the Railway Labor Act is only permissive." 351 U.S. at 231, 76 S.Ct. at 718. Of course, there is no federal jurisdiction until the employer and the union choose to invoke

the authorization granted under section 8(a)(3). To that point their rights may be termed "permissive." But when they actually invoke section 8(a)(3) and execute an agreement under the statute, the obligations cease to be "permissive" and become compelled under the statute.

*Abood* is also supportive of governmental action. It arose out of a state statute, applicable to state employees, which was similar in language to both section 8(a)(3) and section 2, Eleventh, except in one particular: it allowed the union enjoying the rights under an agency contract to collect dues which could be used for lobbying or political purposes. That statute had been enacted because states are exempt from the NLRA's provisions, just as states enacting right-to-work statutes are exempt. *See* 29 U.S.C. § 152(2). Certain state employees assailed the constitutionality of the provision allowing the use of their "dues" for political or lobbying purposes. The state trial court sustained the statute, finding the clause permitting use of the exacted funds did "not violate the Federal Constitution." 431 U.S. at 215, 97 S.Ct. at 1789. On appeal of the state intermediate appellate court's decision reversing and remanding the trial court, the Supreme Court reversed. The Court began by stating: "To compel employees financially to support their collective-bargaining representative has an impact upon their First Amendment interests ... [and may] well be thought ... to interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit." 431 U.S. at 222, 97 S.Ct. at 1793. The Court found, however, that, because of "the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress," a "service charge" may be collected to such extent as it is used to finance "expenditures by the Union for the purposes of collective bargaining, contract administration, and grievance adjustment" but not for political or lobbying purposes. *Id.* at 222, 225–26, 97 S.Ct. at 1793, 1794–95. It then ad-

dressed the question whether there is a difference between public and private employees in this area and dismissed the claim with this significant statement: "The differences between public and private-sector collective bargaining simply do not translate into differences in First Amendment rights." *Id.* at 232, 97 S.Ct. at 1798. It reiterated its construction of *Hanson,* as already quoted, to the effect that the union shop agreement authorized by the RLA was "found to result from governmental action." *Id.* at 226, 97 S.Ct. at 1795.

Governmental involvement and governmental action in this case, as *Abood* makes clear, is indisputable. The right of action herein has its roots in the national labor policy embodied in the NLRA and the Taft-Hartley Act and is a part of that legislated national labor policy, that, according to the opinion of the Supreme Court in *NLRB v. Allis-Chalmers Mfg. Co.,* 388 U.S. 175, 180, 87 S.Ct. 2001, 2006–07, 18 L.Ed.2d 1123 (1967),

> extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all the employees. "Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents...."
> *Steele v. Louisville & N.[ashville] R. Co.,* 323 U.S. 192, 202, 65 S.Ct. 226, 232, 89 L.Ed. 173 [ (1944) ].

That power of a union to exercise this compelling power as the exclusive bargaining representative of employees—both those approving and those objecting—in the unit stems from federal law. It is, as

Justice Douglas said in *Hanson,* when referring to section 2, Eleventh, the "federal statute [which] is the source of the power and authority by which any private rights [of an objecting employee] are lost or sacrificed. [citation omitted] The enactment of the federal statute authorizing union shop agreements is the governmental action on which the Constitution operates, though it takes a private agreement to invoke the federal sanction." 351 U.S. at 232, 76 S.Ct. at 718. And, in *Ellis,* the Supreme Court reiterated this same point. It said:

> Only a union that is certified [under federal law] as the exclusive bargaining agent is authorized to negotiate a contract requiring all employees to become members of or to make a contribution to the union. Until such a contract is executed, no dues or fees may be collected from objecting employees who are not members of the union; and by the same token, any obligatory payments required by a contract authorized by § 2, Eleventh terminate if the union ceases to be the exclusive bargaining agent. 466 U.S. at ——, 104 S.Ct. at 1892, 80 L.Ed.2d at 442.[28]

Again, as the Court in *Hanson* said, the "sanction of government" is "put behind" an agency contract, whether under section 2, Eleventh or under section 8(a)(3), executed by the exclusive bargaining agent. 351 U.S. at 232 n. 4, 79 S.Ct. at 718. Justice Douglas, who had written the opinion in *Hanson,* made this point more emphatic in his dissent from the denial of certiorari, in which Chief Justice Burger concurred, in *Buckley v. American Federation of Television and Radio Artists,* 419 U.S. 1093, 1095, 95 S.Ct. 688, 689, 42 L.Ed.2d 687 (1974):

> both state and federal law were silent about such clauses, and the existence of a permissive, but not compulsory federal statute which may be preempted by contrary state law does not establish that the federal government is the source of authority for the clause. Slip op. at 12–13.

This reasoning contradicts the holding in *Ellis,* 466 U.S. at ——, 104 S.Ct. at 1892, 80 L.Ed.2d at 442, quoted above in the text (p. 1207).

**28.** Since oral argument, counsel for defendants have cited to us *Price v. International Union,* No. H–84–1221, (D.Conn. Apr. 11, 1985). That case is similar to the one under review here. In *Price* the Court found that there was no "governmental action". Its rationale for this conclusion was:

> The union security clause contained in the contract among the defendants here is part of a privately bargained contract among private parties. That clause would be permissible if

When Congress authorizes an employer and a union to enter into union-shop agreements binding and enforceable over the dissents of a minority of employees or union members, it has cast the weight of the Federal Government behind the agreements just as surely as if it has imposed them by statute.

If we were to follow the defendants' reasoning, what the government has done by authorizing the agency shop in section 2, Eleventh and section 8(a)(3) and compelling either union membership or the dues-equivalent contribution as a condition of employment is to vest the union with the right and authority to collect dues to be used for, among other purposes, the support of political candidates, policies, and political ideologies without any right existing in non-consenting employees to a judicial forum for the protection of their First Amendment rights or their rights under section 8(a)(3). Such authority as the union has in this case is grounded directly on the power given it as a result of its status as bargaining representative under the federal statute and under an agency contract that in turn owes its status to another federal statute. When that power—power to collect against the employee's will—to collect the dues-equivalent and to use those funds in a completely unconstitutional way (i.e., for political and lobbying purposes) is exercised by the union entirely under federal authorization, it seems impossible not to find in such union action governmental action. It is true, the actor is the union, but the union acts only under the warrant of federal authority. The union wears the cloak of the government; in making its demands it acts under authority vested in it by the federal government. As Justice Douglas said in his concurring opinion in *Street:* "Since neither Congress nor the state legislature can abridge [First Amendment] rights, they cannot grant the power to private groups to abridge them." 367 U.S. at 777, 81 S.Ct. at 1804. There is, in our opinion, governmental action.

In this case, the two-part test set forth in *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) is fully satisfied. Unquestionably the deprivation in this case is "caused by the exercise of some right or privilege created by the State" and, since the statute clothes the union with the authority to exercise that power, the "conduct [of the union] is otherwise chargeable to the State." *Id.* at 937, 102 S.Ct. at 2754.

Defendants seek to find support for their contrary view in the recent cases of *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) and *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). *Blum* and *Rendell-Baker* both involved conduct by defendants which was clearly private. *Blum* involved a nursing home which was expected to meet certain regulatory requirements, but the transfer of patients, which was the subject of that action, was not within the regulations. In finding an absence of state action, the Court said: "[a] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." 457 U.S. at 1004, 102 S.Ct. at 2786. That language delineates perfectly the difference between this case and *Blum.*

*Rendell-Baker* involved the discharge of a teacher by a private school receiving its support largely from public funds. However, it was expressly agreed between the public bodies and the school that the latter was private and its employees were not "city employees." 457 U.S. at 833, 102 S.Ct. at 2767. The decision to discharge the plaintiff was "not compelled or even influenced by any state regulation." *Id.* at 841, 102 S.Ct. at 2771. That is again quite different from this case where all acts taken were compelled by federal statute.

Defendants also cite *United Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) and *United Steelworkers v. Sadlowski,* 457 U.S. 102, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982). In *Sadlowski,* the Supreme Court found the chal-

lenged conduct valid. In *Weber,* the employer and the union added to their collective bargaining agreement an affirmative action plan. Such addition was purely voluntary, based on no statutory or regulatory authorization. As the Court remarked, such a plan did not involve state action. 443 U.S. at 200, 99 S.Ct. at 2725–26. Neither of these cases adds any force to defendants' objection to our finding of governmental action and thus jurisdiction over the plaintiffs' clearly established constitutional claim. It follows that, in our opinion, governmental action [29] and thus jurisdiction would exist in this case over plaintiffs' constitutional claim.

Satisfied that there is jurisdiction present on both the statutory and constitutional claims of plaintiffs, we turn to the defendants' second claim of error in the decision of the district court.

■ The only remaining issue in this case is directed at determining what expenditures made by the union out of the dues-equivalent collected under an agency contract executed pursuant to section 8(a)(3) were permissible against objecting non-union employees such as plaintiffs. The standard to be used in such determination was recently set forth by the Supreme Court in *Ellis,* by drawing upon and expanding upon the earlier decisions in *Street, Allen,* and *Abood. Ellis* said that objecting employees such as plaintiffs, from whom dues are collected and used under the agency contract, can only be charged for expenditures "necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues." 466 U.S. at ——, 104 S.Ct. at 1892, 80 L.Ed.2d at 442. Under this standard,

the objecting employees "may be compelled to pay their fair share of not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit." *Id.* The objecting employees are entitled to a refund of any amount collected of them by the union beyond these "costs."

■ The burden of proof in establishing the charges validly chargeable under this standard against the objecting employees rests on defendant unions. This was settled by *Allen,* in which the Supreme Court said:

Since the unions possess the facts and records from which the proportion of political to total union expenditures can reasonably be calculated, basic considerations of fairness compel that they, not the individual employees, bear the burden of proving such proportion. Absolute precision in the calculation of such proportion is not, of course, to be expected or required; we are mindful of the difficult accounting problems that may arise. 373 U.S. at 122.

It is at this point in the analysis that the error claimed by defendants emerges. In determining whether the unions met their burden, the special master applied the clear and convincing standard of proof, though the special master modified this somewhat by the language in *Allen* that absolute precision was neither expected nor required. Even as modified, though, this standard of proof conflicts with the standard set forth in *Ellis,* which is that of preponderance of the evidence. 466 U.S. at

**29.** *Compare Linscott v. Millers Falls Co.,* 440 F.2d 14, 17 (1st Cir.), *cert. denied,* 404 U.S. 872 92 S.Ct. 77, 30 L.Ed.2d 116 (1971), *Seay v. McDonnell Douglas Corp.,* 427 F.2d 996, 1000 (9th Cir.1970), *Havas v. Communications Workers,* 509 F.Supp. 144, 148–49 (N.D.N.Y.1981), and *Lykins v. Aluminum Workers Int'l Union,* 510 F.Supp. 21, 24–26 (E.D.Pa.1980) *with Kolinske v. Lubbers,* 712 F.2d 471, 474–80 (D.C.Cir.

1983), *Hovan v. United Bd. of Carpenters and Joiners,* 704 F.2d 641, 642–45 (1st Cir.1983), *Reid v. McDonnell Douglas Corp.,* 443 F.2d 408, 410–11 (10th Cir.1971), *further proceedings,* 479 F.2d 517 (10th Cir.), *cert. denied,* 414 U.S. 1076, 94 S.Ct. 592, 38 L.Ed.2d 483 (1973), *and Price v. International Union,* No. H–84–1221, slip op. at 12–13 (D.Conn. Apr. 11, 1985).

—— n. 15, 104 S.Ct. at 1897 n. 15, 80 L.Ed.2d at 447 n. 15.

Defendants' specific claim of error is that the special master used the improper standard of proof and that the district judge affirmed such use. It is clear that the special master erred in his standard of proof. However, it does not follow that all the conclusions of the special master, as affirmed by the district judge, must be vacated. Defendants identify no findings made by the special master and confirmed by the district judge which were made on the basis of this standard; they apparently would presume, however, nothing else appearing, that any finding of disputed fact was tainted by error due to the application of the incorrect standard. But, even accepting defendants' argument, it means that only those conclusions in which there was a dispute in the evidence are vulnerable to attack on the ground that the special master had weighed and resolved the facts by the use of an incorrect standard of proof. If the conclusion of the special master was one of law and required no evaluation of conflicts in evidence or if it was based on an absence of *any* evidence, the error in application of the incorrect standard of proof could not be said to have influenced the decision and would thus be harmless. Our problem, therefore, is to ascertain the findings or conclusions of the special master as confirmed by the district judge which may have been affected or influenced by the application of the incorrect standard of proof.

In doing this, however, we must recognize that there are two sets of defendants; one, CWA, the national union, and the other, the locals. The fee collected from the employees under the agency contract was divided between the two on a 40–60% basis, respectively. The national and the local unions have made separate presentations and we must, therefore, deal separately with the expenditures of CWA and the locals. We shall begin with CWA's proof of expenditures.

■ CWA, through its expert witness, a certified public accountant, reviewed the expenditures made by CWA for the years in question and classified them under eight headings. The special master accepted the witness' listing of expenditures and the classifications within which he grouped these expenditures. He found no occasion in dealing with four of these classifications to inquire into the accuracy of the charges or the propriety of the classification. He did this because he found these groups to include charges impermissible against plaintiffs as a matter of law. He gave specific reasons in each instance for this disallowance. None of these reasons, we emphasize, represented a resolution of disputed facts but instead represented a determination that as a matter of law the expenditures were not chargeable to plaintiffs. We consider each of these disallowed categories of expenditures:

(1) The first of these disallowed expenditures were those CWA itself classified as "political." It seems that CWA concedes the propriety of this disallowance. Had defendants not conceded the inadmissibility of these expenditures as charges against plaintiffs, *Street* would have compelled their disallowance.[30]

(2) The second category of expenditures found by the special master to be impermissible were "labor legislation" expenditures. This disallowance was based on two grounds: First, he found that in large part these expenditures covered costs of "lobbying efforts" by CWA "far remote ... from collective bargaining, contract negotiation and grievance ad-

---

**30.** Professor Cantor has suggested that Congress in the Taft-Hartley Act banned the use of union fees in federal elections. Cantor *supra* note 2 at 72–76, 49 Notre Dame L.Rev. He argues that Congress thereby manifested its awareness of the problem and the fact that it did not include a similar prohibition in § 8(a)(3) of the Act indicates an intention by Congress not to pro-hibit such use in connection with that section. To sustain any such theory would be to reverse the decisions in *Street, Allen,* and *Abood.* We refuse the suggestion and choose to abide by the decision which the Supreme Court has reached in those cases dealing with § 2, Eleventh of the RLA which is similar to § 8(a)(3).

justment," for instance, "lobbying efforts on behalf of the adoption of the Panama Canal Treaty, and the Equal Rights Amendment." He suggested that there might have been some areas such as "the Telecommunications Act or Occupational Health and Safety Regulations" where "lobbying" would have some relevance, but the special master said CWA had made no effort to identify any such permissible "lobbying activities" or to offer any evidence in support. The disallowance seems justified under *Abood*.[31]

(3) "Community services" expenditures were also found inadmissible charges as a matter of law. In reaching that conclusion, the special master held that such expenditures did "not directly relate to, and are not reasonably necessary, in the opinion of the Special Master, for the proper effectuation of collective bargaining, contract administration and grievance adjustment." He added that First Amendment rights were involved in this situation because employees "may not approve of the particular charities receiving the largess of the Union" and the employees "may well have their own favorite charities ... to which they may wish to contribute the portion of their agency fee payments allocated by the Union to charitable contributions." This disallowance seems to accord with the test stated in *Ellis*.[32]

(4) Finally, the special master disallowed what CWA identified as expenditures for "organizing." Incidentally, this is the only specifically disallowed class of expenditures which CWA claimed to be erroneous in its exceptions to the special master's report. However, *Ellis* held that such expenditures were not allow-

able charges against the objecting employees because "such expenditures are outside Congress' authorization." 466 U.S. at ——, 104 S.Ct. at 1894, 80 L.Ed.2d at 444. The Supreme Court gave a number of reasons supporting their decision. These began with the statement of the legislative purpose of the enabling legislation: "We remain convinced that Congress' essential justification for authorizing the union shop was the desire to eliminate free riders—employees in the bargaining unit on whose behalf the union was obliged to perform its statutory functions, but who refused to contribute to the costs thereof." *Id.* at ——–——, 104 S.Ct. at 1892, 80 L.Ed.2d at 441–442. The Court concluded with this comment: "Organizing money is spent on people who are not union members, and only in the most distant way works to the benefit of those already paying dues. Any free-rider problem here ... is a far cry from the free-rider problem with which Congress was concerned." *Id.* at ——, 104 S.Ct. at 1894–95, 80 L.Ed.2d at 445.

The error in the standard of proof had no connection with the findings and conclusions on the chargeability of expenditures in these four categories and cannot provide a justification for a reversal. We therefore affirm the decision of the district court in approving the special master's disallowance of CWA's expenditures under the following four classifications made by defendants' accountant: "political," "labor legislation," "community services," and "organizing." There were four other classifications of expenditures identified by CWA's expert. One of these, headed "administrative," was a catch-all, spread out over the other seven

---

**31.** In *Robinson v. New Jersey*, 741 F.2d 598 (3d Cir.1984), the court appears to have sustained "lobbying" expenditures by public employees because of the unique relationship of public employees' working conditions, wages, etc. to legislation. It is not easy to reconcile this decision with *Abood*. However, we are not here concerned with public employees and the unique considerations which influenced the decision in *Robinson* are not present here.

**32.** The only justification offered by CWA before the special master for the allowance of these expenditures as charges against plaintiffs was that such expenditures "creat[ed] a favorable climate of public sympathy and support when collective bargaining time arrives and particularly when there is a strike." We agree with the special master and the district judge that, under the test stated in *Ellis*, such expenditures were not "reasonably necessary ... for the proper effectuation" of collective bargaining.

classifications on a proportionate basis, and appears to create no problems. The other classifications in the grouping of expenditures were disbursements for "collective bargaining," "grievances," and "contract administration" purposes. The expenditures in these areas were also listed and identified as to their particular purpose by CWA. Some items of expenditures included in these areas were disallowed by the special master. Thus, he disallowed all expenditures listed under the heading of "Foreign Affairs." CWA had other expenditures identified for the purpose of "Defense Funds." Included in such expenditures was a substantial contribution to the United Mine Workers in support of their strike. This expenditure was disallowed by the special master. CWA had a grouping of expenditures in an area titled by it as "Publicity and Public Relations," which the president of CWA, according to the special master, classified as "Organizing." On that basis the special master disallowed the expenditures under this grouping. We agree with the special master's rulings on these disallowed items, as approved by the district judge. Their disallowance was made on the ground that such expenditures did not qualify for allowance under the rule as enunciated by the Supreme Court in *Ellis.* Such decisions by the special master could not have involved in any way the erroneous standard for evaluating disputed questions of fact and are affirmed.

■ The other expenditures listed under the broad classifications of "collective bargaining," "grievance," and "contract administration," included various items such as "Convention and Related Committees," "Development and Research," "Professional Fees," and "Education." The differences between the special master and CWA did not concern the propriety of the titles. Unlike the situation in connection with the four classifications first discussed, where the items were disallowed as not admissible charges as a matter of law, it seemed that expenditures under these headings were reviewed on their facts. Most of these expenditures consisted of personal services.

CWA's auditor relied in his compilation of these cost items on the estimate given him in interviews by the employees involved. CWA also called as witnesses some of the individuals involved to substantiate the charges. These witnesses confirmed the estimates of their time devoted to collective bargaining matters of the units involved here as shown on the auditor's figures. On cross-examination, however, these witnesses described their allocations of time to such duties as merely "guesses" and these witnesses were less than firm in their testimony. Moreover, CWA's accountant likened the problem of making a proper allocation of the employees' work time devoted to collective bargaining, grievance, and contract administration as difficult as "making a frog fly." He was unwilling to certify the charges. There were quite a number of employees, whose time was in whole or in part charged to collective bargaining, who were never called and gave no testimony on the expenditures listed covering the time they devoted to such collective bargaining. Because of the showing made by CWA, these charges were largely disallowed by the special master. On the record before us, it is not possible to determine whether the special master, in reaching this conclusion, applied a "clear and convincing" standard of proof. For that reason, the allocation as it relates to these three classifications ("collective bargaining", "grievance," and "contract administration"), except for those items included therein specially found by us earlier to be improper charges ("Foreign Affairs," "Publicity and Public Affairs," and a part of the "Defense Fund") must be remanded to the district court.

On remand, we would assume the district judge will recommit the cause to the special master. It is to be hoped, however, that it will not be necessary on remand to take any extensive evidence. After all, the relevant evidence is already in the record. The problem is one of weighing the evidence by the proper standard of proof. It should be possible for this to be done promptly based largely, if not entirely, on the testimony

already taken and without any great delay. This case has been pending for six years; it is time for it to be concluded. The parties' legal rights have been settled and the amount of monetary judgment is not large. The parties should cooperate to expedite the further resolution of this action.

Our discussion has so far dealt with the liability of CWA itself. It remains to confront the same issues as they relate to the local unions. Here the problem is the dearth of any reliable record of expenditures. In the opinion of the special master, the records of but one local union were sufficiently complete to give any reliable picture of the local's expenditures and this was for only one year. The special master accepted the records of this one local as typical of all the locals. The special master said he was unable to identify more than two percent of the local's expenditures which would have been admissible charges against plaintiffs. The other expenditures appeared to him to be inadmissible, but, even if the local was given the benefit of every doubt, it would be impossible, in his opinion, to regard as permissible charges against plaintiffs any more than the amount of permissible expenditures allowable in favor of CWA (i.e. nineteen percent).

Obviously, the special master was not using a "clear and convincing" standard of proof in weighing the testimony on expenditures by the local unions. The problem, however, is that the special master reached his conclusion basically on his findings made in connection with CWA's expenditures, and, since we have remanded for further review on those findings, it would seem to follow that we must, under the same terms, remand the issue of the liability of the local unions.

We now turn to plaintiffs' objections. Their first contention on appeal is that the permanent injunction granted by the district court is statutorily inadequate. The injunction allows CWA to charge plaintiffs the full amount of regular member dues subject to reduction by an amount an independent certified public accountant later determines to be non-retainable. The injunction also makes provision for an interest-bearing escrow account which shall contain twice the amount determined in the previous fiscal year to be non-retainable. Plaintiffs contend the injunction permits CWA to use their agency fees for improper purposes, contrary to the holding in *Ellis v. Brotherhood of Railway, Airline and Steamship Clerks*, 466 U.S. at ———, 104 S.Ct. at 1889–91, 80 L.Ed.2d at 438–39. On the contrary, the permanent injunction here at issue complies with the mandate of *Ellis*. In *Ellis*, the Supreme Court stated that a pure rebate approach, which permits a union to collect from agency fee payors full union dues subject only to later reduction, is statutorily inadequate because:

> [T]he union obtains an involuntary loan for purposes to which the employee objects.
>
> The only justification for this union borrowing would be administrative convenience. But there are readily available alternatives, such as advance reduction of dues and/or interest-bearing escrow accounts, that place only the slightest additional burden, if any, on the union. Given the existence of acceptable alternatives, the union cannot be allowed to commit dissenters' funds to improper uses even temporarily.

*Id.* at ———, 104 S.Ct. at 1890, 80 L.Ed.2d at 439. While striking down the pure rebate approach, the Court explicitly approved of an approach incorporating an interest-bearing escrow account, similar to the injunction formulated by the district court in the case *sub judice*. Under the injunction prescribed by the district court, CWA will be unable to "commit dissenters' funds to improper uses even temporarily" because the escrow account is not subject to CWA control. Consequently, the permanent injunction prescribed by the district court adequately protects plaintiffs' rights because CWA will derive no benefit from the

amount determined to be non-retainable.[33] *Hudson v. Chicago Teachers Union Local No. 1*, 743 F.2d 1187, 1197 (7th Cir.1984).

Plaintiffs also contend that the permanent injunction is inadequate because it provides that only if an agency fee payor is successful in challenging the amount determined by an accountant to be non-retainable will the cost of the challenge be taxed to CWA. Plaintiffs contend that CWA should bear the cost of *any* challenge made to the amount determined to be non-retainable. In this respect, plaintiffs simply ask for too much. They have been granted an injunction prohibiting CWA from collecting amounts unrelated to CWA's duty to represent the employees in labor-management relations and it is clear that CWA will not benefit from amounts determined to be non-retainable. To burden CWA with the cost of any challenge to the non-retainable amount, however frivolous, would not only encourage meritless challenges but also unfairly burden the union's other dues-paying members. Plaintiffs' rights are adequately protected by reimbursement for the cost of a successful challenge to the non-retainable amount.

The judgment of the district court is accordingly

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

33. Plaintiffs further contend that only an advance reduction approach can adequately protect their statutory rights. This contention, however, is without merit, for the Supreme Court in *Ellis* expressly sanctioned either an advance reduction *or* an interest-bearing escrow account approach. Either approach is adequate, because each prevents a union from extracting a forced loan from non-consenting payors.

1. Subsection 8(a), as codified at 29 U.S.C. § 158(a), provides in pertinent part:
    (a) It shall be an unfair labor practice for an employer—

    .     .     .     .     .

    (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall

HARRISON L. WINTER, Chief Judge, dissenting:

I dissent. Plaintiffs contend that use of their agency shop fees for purposes not directly related to collective bargaining, grievance adjustment, or contract administration violates both the first amendment and § 8(a)(3) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a). I conclude that the statutory claim fails because § 8(a)(3) cannot fairly be read to impose such limits on a union's use of the fees it collects. I further conclude that the first amendment claim fails because the defendant unions' use of plaintiffs' fees does not constitute state action. I would therefore reverse and direct entry of judgment for the defendants based on plaintiffs' failure to state a claim upon which relief can be granted.

I. Statutory Claim

Plaintiffs argue that the unions' use of their agency shop fees violates an implied right under § 8(a)(3) of the NLRA "not to be required to pay money, over objection, for [the union's] expenses not directly related to collective bargaining, contract administration and grievance processing." Brief for Appellee at 32. This construction of the statute finds no support in the express language of the statute. Section 8(a)(3) is part of the subsection listing employers' unfair labor practices;[1] plaintiffs

preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later ...: *Provided further,* That no employer shall justify any discrimination against an employee for non-membership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership ...

read into the provision a limit on *unions,* the violation of which is *not* an unfair labor practice.[2] Nor does this construction find any explicit support in legislative comment on the meaning of the subsection. Plaintiffs nevertheless argue that their construction of § 8(a)(3) has the virtue of letting us avoid the state action question presented here. Before reaching a difficult constitutional question, they note, we must first ascertain whether a construction of the statute is fairly possible by which the constitutional question may be avoided. *International Association of Machinists v. Street,* 367 U.S. 740, 749, 81 S.Ct. 1784, 1789–90, 6 L.Ed. 1141 (1961).

I conclude that plaintiffs' proposed interpretation of § 8(a)(3) is not *fairly* possible, and that plaintiffs therefore have no statutory claim. Both the language of § 8(a)(3) and its legislative history show that Congress did not intend to limit the use of agency shop fees under the NLRA.[3] Further, the history and purpose of this provision differs from the history and purpose of the agency shop provision in the Railway Labor Act; thus the Railway Labor Act's limits on fee use should not be engrafted onto the NLRA's § 8(a)(3).

Congress enacted § 8(a)(3) as part of the National Labor Relations Act of 1935, 29 U.S.C. § 141 *et seq.* That Act permitted closed shop agreements—those requiring union membership as a precondition to employment—unless such agreements were prohibited by state law. *See Colgate-Palmolive-Peet Co. v. National Labor Relations Board,* 338 U.S. 355, 361, 70 S.Ct. 166, 169–70, 94 L.Ed. 355 (1949). The La-bor Management Relations Act of 1947 (the Taft-Hartley Act) amended § 8(a)(3) to prohibit the closed shop. Section 8(a)(3), however, continued to permit agency shop agreements—those requiring all employees to pay the equivalent of dues—unless prohibited by state law.

In enacting the Taft-Hartley Act, Congress explicitly considered the union practice of spending dues and fees for various purposes not directly related to collective bargaining. One of the prominent witnesses at the congressional committee hearings, the movie director Cecil B. DeMille, testified on this issue, using the example of his own experiences:

> In my case the right of political freedom was invaded [by the union] when I was given the choice between working or paying a political assessment … Because I refused to pay a political assessment, I was deprived of the right to work.

Labor Relations Program: Hearings on S. 55 and S.J.Res. 22 Before the Committee on Labor and Public Welfare, 80th Cong., 1st Sess. 801, 797 (1947), *cited in* S.Rep. No. 105, 80th Cong., 1st Sess. 7 (1947). DeMille objected strenuously to such exactions. He suggested that permitting agency shop agreements would be sufficient to solve the "free rider" problem of employees benefiting from union activity without contributing to its cost. Such a provision, he urged, should "provide that the service charge must be fair and not excessive." He further urged that "[p]olitical assessments and improper levies should be absolutely banned in any case." *Id.* at 806.

---

Actions constituting "an unfair labor practice for a labor organization" are listed in subsection 8(b).

**2.** If plaintiffs simply raised this § 8(a)(3) claim as an unfair labor practice then the National Labor Relations Board would have exclusive jurisdiction. *See San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 245, 79 S.Ct. 773, 779–80, 3 L.Ed.2d 775 (1959). Plaintiffs have instead characterized the alleged violation of § 8(a)(3) for jurisdictional purposes as both a "Breach of Implied Conditions of Contract and Statute" and a breach of the statutory duty of fair representation. Complaint at 18; Appellees'

Supplemental Brief at 2–4. *See also* majority opinion, *ante* at 1203–1205. The proper interpretation of the NLRA, as shown *infra,* defeats plaintiffs' statutory claim, however stated; Congress simply did not intend to allow the external review of union expenditures that plaintiffs seek. *Cf. Price v. International Union,* U.A.W., No. H–84–1221, slip op. 15–18 (D.Conn. April 11, 1985) (complaint about union's use of agency shop fees would not support duty of fair representation claim).

**3.** *See also* Cantor, Uses and Abuses of the Agency Shop, 49 Notre Dame L.Rev. 61, 72 ff. (1983).

Congress acknowledged the problem of the worker who "has been compelled to contribute to causes and candidates for public office to which he was opposed." H.R.Rep. No. 245, 80th Cong., 1st Sess. 4 (1947) ("House Report"). To remedy this problem the initial House bill proposed two solutions. First, the bill declared that "[m]embers of any labor organization shall have the right to be free from *unreasonable* or discriminatory financial demands of such organization." H.R. 3020, 80th Cong., 1st Sess. § 7(b) (1947) (emphasis added). To implement this policy, the bill made it an unfair labor practice for a union

> to impose initiation fees in amounts in excess of $25 per member unless the Board shall find that initiation fees greater than that amount are reasonable under the circumstances; or to impose any dues or general or special assessments that are not uniform upon the same class of members, or are in excess of such *reasonable* amounts as the members thereof, whom such organization represents or seeks to represent as a representative under section 9, by a majority of those voting, after due notice to the membership, shall authorize ...

H.R. 3020, 80th Cong., 1st Sess. § 8(c)(2) (1947) (emphasis added). The House Report suggested that "[w]hat is reasonable will depend upon the size of the organization, the wage rates of its members, the benefits it confers, the stability of membership and of employment in the trades and industries in which the members work and other relevant factors." House Report at 31.

Second, the bill amended the Federal Corrupt Practices Act to make it unlawful for a union "to make a contribution or expenditure in connection with" any political election, primary or political convention to select candidates. H.R. 3020, 80th Cong., 1st Sess. § 304 (1947). This provision meant that unions could use direct contributions for election activities, but only if "the dues which [employees] pay into the union treasury are not used for such purpose." 93 Cong.Rec. 6440 (1947) (statement of Sen. Taft), *quoted in United*

*States v. CIO*, 335 U.S. 106, 119, 68 S.Ct. 1349, 1356, 92 L.Ed. 1849 (1948).

The House bill's attempt to monitor the "reasonableness" of union fees was part of a general proposal to enact a "bill of rights" to limit union power. *See* 93 Cong. Rec. 3581 (statement of Rep. MacKinnon). This proposal met with extensive criticism. The House Minority Report faulted the bill's attempt to subject unions "to an external control of purely internal functions which is without parallel when compared to any other form of voluntary association." The report noted in particular the "extreme restriction of t_.2 internal activities of the union" imposed by such provisions as "the regulation of initiation fees and dues." These restrictions, the Minority Report asserted, would be both unfair to unions and unworkable in practice:

> These regulatory measures are not an appropriate subject for Federal legislation. Attempts by the Board to secure these rights for employees and union members and to regulate these activities would be attempting the impossible, i.e., attempting a regulation of the infinite details involved in the internal functioning of thousands of trade-unions having millions of members. No standards are provided in the bill to guide the Board, and none exist in fact. *For years most of our State courts have carefully refrained from such interference* in the internal affairs of unions, *realizing both the encroachment on individual liberty* involved in thus attempting to regulate the inner functioning of voluntary associations *and the sheer impossibility of doing so effectively, wisely, and equitably.*

House Report at 76 (minority) (emphasis added). *See also* 93 Cong.Rec. 3586 (1947) (statement of Rep. Powell). Those opposing the "bill of rights" provisions, as these excerpts show, preferred a hands-off policy for both agencies and courts.

The provisions regulating the "reasonableness" of dues, § 7(b) and § 8(c)(2), did not survive in the bill agreed on by the

Conference Committee. Instead, the final bill added § 8(b)(5), which made it an unfair labor practice for unions to require initiation fees that the National Labor Relations Board "finds excessive or discriminatory under all the circumstances." 29 U.S.C. § 158(b)(5). The Senate conferees refused to agree to the House bill's "bill of rights" provisions,

> since they felt that it was unwise to authorize an agency of the Government to undertake such elaborate policing of the internal affairs of unions ... without further study of the structure of unions. In the opinion of the Senate conferees the language [in § 8(a)(3) ] which protected an employee from losing his job if a union expelled him for some reason other than nonpayment of dues and initiation fees, *uniformly required of all members,* was considered sufficient protection.

93 Cong.Rec. 6601 (1947) (statement of Sen. Taft) (emphasis added).[4]

Some congressmen still worried that even the new provision, § 8(b)(5), "would require the Board to determine whether union fees were excessive or discriminatory." 93 Cong.Rec. 6662 (1947) (statement of Sen. Murray). "For example," one senator suggested, "in determining whether a particular fee was excessive the Board may

have to decide ... whether expenditures authorized by the union such as donations to charity were proper." *Id.* at 6662. *See also id.* at 6655, 6673. Senator Taft, the sponsor of the bill, answered such comments with the observation that "[t]he express language of [§ 8(b)(5) ] shows how unfounded such an argument is." The provision, he noted, "is limited to initiation fees and does not cover dues."[5] 93 Cong. Rec. 7001 (1947). The purpose of § 8(b)(5), as the conferees made clear, was simply to prevent unions from continuing their closed shop monopoly of certain trades by charging exorbitant initiation fees to new employees who were not already union members. *See* 93 Cong.Rec. 6601, 7001 (1947) (statements of Sen. Taft).

Of the proposed provisions governing the use of regular dues and fees, only § 304 survived in the final bill.[6] This legislative history makes it clear that Congress explicitly delineated the types of union dues collection that it deemed impermissible: exorbitant initiation fees and fees spent for political elections. Congress went this far and no farther; it excluded no other areas of expenditure from the union's power to collect dues under a union security agreement. And "[a]s a matter of statutory construction, the authorities appear uniform in holding that an explicit exclusion

---

**4.** Congress later did enact a "bill of rights" for employees, as part of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 *et seq. See United Steelworkers of America v. Sadlowski,* 457 U.S. 102, 109, 102 S.Ct. 2339, 2344, 72 L.Ed.2d 707 (1982).

**5.** Subsection 8(b), as codified at 29 U.S.C. § 158(b), provides in pertinent part:

> (b) It shall be an unfair labor practice for a labor organization or its agents—
>
> .     .     .     .     .
>
> (5) to require of employees covered by an agreement authorized under [§ 8(a)(3) ] the payment, as a condition precedent to becoming a member of such organization, of a fee in an amount which the Board finds excessive or discriminatory under all the circumstances. In making such a finding, the Board shall consider, among other relevant factors, the practices and customs of labor organizations in the particular industry, and the wages currently paid to the employees affected....

**6.** Section 304 was codified as 18 U.S.C. § 610, and applied to all labor unions. By the time Congress amended the RLA in 1950, however, the provision had proven largely ineffective. The Supreme Court avoided holding § 304 unconstitutional only by giving it a very narrow construction. *United States v. CIO,* 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948). After this decision the government given constitutional doubts about the statute, brought almost no new indictments under § 304 until 1955, and in 1949 Senator Taft brought about the provision's repeal in the Senate (the House failed to take action on the bill). *See* Rauh, Legality of Union Political Expenditures, 34 S.Cal.L.Rev. 153, 158–59 (1961).

Congress repealed § 304 in 1976, replacing the provision with 2 U.S.C. § 441b, which prohibits the use of agency shop fees by labor organizations in connection with federal elections. 2 U.S.C. § 441b(b)(3). Plaintiffs have not pursued a claim here under this statute, which requires administrative proceedings for enforcement. *See* 2 U.S.C. § 437g(a).

appearing in and specifically limited to one provision of a statute and not included in another provision of the same statute logically implies that the exclusion is inapplicable as to the latter provision." *League to Save Lake Tahoe, Inc. v. Trounday*, 598 F.2d 1164, 1171 (9 Cir.), *cert. denied*, 444 U.S. 943, 100 S.Ct. 299, 62 L.Ed.2d 310 (1979).

We cannot entertain a claim alleging a union's inappropriate use of funds without contradicting Congress' intent in the Taft-Hartley Act to avoid general external supervision of internal union matters. Those in Congress who opposed external supervision of union dues collection argued that it was invasive and impractical. Here the proceedings exemplify precisely the situation that Congress decided to avoid in defeating the amendment to supervise union dues collection. The proceedings for this single union have already required over 9 years, over 4,000 pages of testimony, over 3,000 documents, and over 50 motions filed in the district court. Two district judges, a special master, batteries of lawyers, and countless witnesses, stenographers and clerks have contributed their services to this project. Even now the accounting remains unfinished, as the majority has ordered a remand. This exhaustive inquest, into every jot and tittle of a union's finances and activities, is *not* what Congress intended in passing the Taft-Hartley Act.

The argument that § 8(a)(3) of the NLRA limits the use of agency shop fees relies heavily on the established interpretation of § 2, Eleventh of the Railway Labor Act (RLA), 45 U.S.C. § 152.[7] The Supreme Court has construed that provision to deny a union authority to spend dissenting employees' agency fees for purposes other than collective representation. *See Street*, 367 U.S. at 768–69, 81 S.Ct. at 1799–1800; *Ellis v. Brotherhood of Railway, Airline and Steamship Clerks*, 466 U.S. 435, ——, 104 S.Ct. 1883, 1892, 80 L.Ed.2d 428, 442 (1984). I do not agree that this interpretation of the RLA controls our interpretation of § 8(a)(3). "Even rough analogies [between the RLA and the NLRA] must be drawn circumspectly, with due regard for the many differences between the statutory schemes." *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 383, 89 S.Ct. 1109, 1118, 22 L.Ed.2d 344 (1969) (footnote omitted). Here, despite the similarity of certain phrases in the RLA's § 2, Eleventh and the NLRA's § 8(a)(3), careful comparison of the NLRA and the RLA shows that the two provisions differ in terms of language, legislative history, and statutory purpose. The settled interpretation of the RLA therefore does not bind us here.

Congress enacted § 2, Eleventh in 1950, when it amended the Railway Labor Act. The Railway Labor Act as amended in 1934, unlike the National Labor Relations Act of 1935, prohibited closed and union shop agreements. At the time of the 1934 amendments, railroad unions urged Congress not to prohibit all union security agreements in their industry. Only one of the standard unions, however, had any se-

---

7. Section 2, Eleventh is part of a list of general duties established by the RLA. As codified at 45 U.S.C. § 152, this section provides in pertinent part:

Eleventh. Notwithstanding any other provisions of this chapter, or of any other statute or law of the United States, or Territory thereof, or of any State, any carrier or carriers as defined in this chapter and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted—

(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: *Provided,* That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership.

curity agreements in its contracts at that time; the rest remained committed to the principle of voluntarism despite their support for allowing such agreements. *Street,* 367 U.S. at 750–51, 753 n. 8, 81 S.Ct. 1790–91, 1791–92 n. 8. Given this "strong and long-standing tradition of voluntary unionism," and the opposition of some legislators to the union shop, Congress embraced a "policy of complete freedom of choice of employees to join or not to join a union." *Id.* at 750, 81 S.Ct. at 1790.

The RLA ban on union security agreements continued until 1950, when Congress amended the Act to authorize union shop agreements whether or not permitted by state law. In pressing for this amendment, the railroad unions argued that it was "essentially unfair for nonmembers to participate in the benefits of [labor unions' activities] without contributing anything to the cost." Railroad witnesses emphasized that their collective bargaining costs were higher than those for other industries, since the RLA's complex administrative machinery "requires expense which is not known to unions in outside industry." Hearings on H.R. 7789, House Committee on Interstate and Foreign Commerce, 81st Cong.2d Sess. 10 (statement of George M. Harrison, spokesman for Railway Labor Executives' Association), *quoted in Street,* 367 U.S. at 761–62, 81 S.Ct. at 1796–97. "This argument was decisive with Congress." *Street,* 367 U.S. at 762, 81 S.Ct. at 1796.

The legislative history of the 1950 RLA amendment is ambiguous on the issue of limiting unions' use of agency shop fees. Indeed, as the Supreme Court has noted in *Abood v. Detroit Board of Education,* 431 U.S. 209, 232, 97 S.Ct. 1782, 1798, 52 L.Ed.2d 261 (1977), its opinion in *Street* "embraced an interpretation of the Railway Labor Act not without its difficulties." Two congressional committee witnesses, both railroad company representatives, did complain that the proposed RLA amendments would place no limits on unions' use of dues. *See Ellis,* 80 L.Ed.2d at 440 n. 9; *Street,* 367 U.S. at 767 n. 16, 81 S.Ct. at 1799 n. 16. "That Congress enacted [§ 2, Eleventh] over these objections arguably

indicates that it was willing to tolerate broad exactions from objecting employees." *Ellis,* 80 L.Ed.2d at 440.

The Supreme Court in *Street* nevertheless read into § 2, Eleventh a limitation on the railroad unions' power to use agency shop fees. In doing so, the Court pointed out that § 2, Eleventh was revised to meet the objections that the RLA as amended would not adequately protect the free speech rights of dissenting employees. *Street,* 367 U.S. at 765–66, 81 S.Ct. at 1798–99. The railroad unions responded to the concerns voiced about such employees by suggesting the addition of a proviso to prevent job loss for "employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, fees, and assessments uniformly required as a condition of acquiring or retaining membership." Railway Labor Act Amendments: Hearings on H.R. 7789 Before the Committee on Interstate and Foreign Commerce, 81st Cong., 2d Sess. 247 ("House Hearings"), *quoted in Street,* 367 U.S. at 765, 81 S.Ct. at 1798. The union president presenting this proviso, the *Street* opinion notes, suggested that the revision "remedies the alleged abuses of compulsory union membership as claimed by the opposing witnesses, yet makes possible the elimination of the 'free rider' and the sharing of the burden of maintenance by all of the beneficiaries of union activity." House Hearings at 253, *quoted in Street,* 367 U.S. at 765–66, 81 S.Ct. at 1798–99 (statement of George M. Harrison). To this protective proviso Congress "affixed ... additional limitations." *Street,* 367 U.S. at 766, 81 S.Ct. at 1799.

The Supreme Court discerned in these revisions of § 2, Eleventh a "congressional concern over possible impingements on the interests of individual dissenters from union policies." This legislative history convinced the Court that

Congress did not completely abandon the policy of full freedom of choice embodied in the 1934 [Railway Labor] Act, but

rather made inroads on it for the limited purpose of eliminating the problems created by the "free rider." That policy survives in § 2, Eleventh in the safeguards intended to protect freedom of dissent.

*Id.* at 767, 81 S.Ct. at 1799. The Court has found that a union's use of compelled dues for purposes other than its collective bargaining duties does not serve the "limited purpose" of eliminating the free rider problem, and is therefore an unjustifiable inroad on the policy of full freedom of employee choice violating § 2, Eleventh. *See id.* at 768–69, 81 S.Ct. at 1799–1800; *Ellis,* 80 L.Ed.2d at 441–42.

The legislative history and purpose of the NLRA and Taft-Hartley Act do not permit the same interpretation of § 8(a)(3). First, the NLRA never embraced the 1934 RLA's policy of "complete freedom of choice of employees to join or not to join a union" that "survives in § 2, Eleventh." *Street,* 367 U.S. at 750, 767, 81 S.Ct. at 1799. Rather, the NLRA's policy has been to leave the question of union shop agreements to state law. Hence the settled interpretation of § 2, Eleventh—based on the underlying policy of the 1934 Railway Labor Act where the statute and legislative history are ambiguous—does not control interpretation of a provision in the NLRA, which does not share the 1934 Railway Labor Act's underlying policy.

If the legislative purposes behind § 8(a)(3) and § 2, Eleventh were identical, one would expect that the Supreme Court in *Street* would have looked to the NLRA for guidance in interpreting § 2, Eleventh. The *Street* opinion, however, does not significantly rely on or discuss either the NLRA or § 8(a)(3). Instead, it focuses on the distinctive features of the railroad industry and the Railway Labor Act in construing § 2, Eleventh.

Second, the Taft-Hartley Act's legislative history, unlike the RLA's, is unambiguous on the issue of limiting the use of union shop fees. Congress explicitly considered the problem of unions using compelled fees when it enacted the Taft-Hartley Act in 1947. Its response was to prohibit union spending in the particularly sensitive area of federal elections. It explicitly rejected amendments requiring more thoroughgoing supervision of union shop fees, however, as unjustifiably intrusive and unmanageable. We should respect this Congressional intent in construing § 8(a)(3). "We cannot press statutory construction 'to the point of disingenuous evasion' even to avoid a constitutional question." *United States v. Locke,* — U.S. —, —, 105 S.Ct. 1785, 1793–95, 85 L.Ed.2d 64 (1985), quoting *Moore Ice Cream Co. v. Rose,* 289 U.S. 373, 379, 53 S.Ct. 620, 622, 77 L.Ed.2d 1265 (1933).

I reject the argument that § 8(a)(3) and § 2, Eleventh may not properly be construed differently. The argument is grounded on remarks made by a few congressmen during the enactment of the RLA. But these remarks are only general comments about the similarity of the Taft-Hartley union security provisions, rather than explicit comparisons of § 8(a)(3) with the provisions of the RLA. Plaintiffs quote Senator Taft as declaring during debate that the bill "inserts in the railway mediation law almost the exact provisions ... of the Taft-Hartley law, so that the conditions regarding the union shop and the check-off are carried into the relations between railroad unions and railroads." In fact, Senator Taft commented:

> In effect, the bill inserts in the railway mediation law almost the exact provisions, *so far as they fit,* of the Taft-Hartley law ...

96 Cong.Rec. ——— (1950), *reprinted in* Comm. on Labor and Public Welfare, 93d Cong., 2d Sess., Legislative History of the Railway Labor Act, as Amended (1926 through 1966) at 1134 (1974).

The conclusion that § 8(a)(3) and § 2, Eleventh are identical in purpose should not rest on such ambiguous comparisons. Indeed, comparing the language of § 8(a)(3) and § 2, Eleventh reveals several obvious differences. Section 8(a)(3) states what employers may do in making agency shop agreements; § 2, Eleventh states

what employers and *unions* may do. Section 8(a)(3) prohibits employer discrimination against an employee if the employer has reasonable grounds for believing that an employee was denied union membership for an impermissable reason; § 2, Eleventh has no such explicit provision. Section 8(a)(3) allows termination for an employee's failure to pay "the periodic dues and the initiation fees" uniformly required from employees; § 2, Eleventh speaks instead of "periodic dues, initiation fees, and assessments (not including fines and penalties)." Section 8(a)(3) agency shop agreements may give employees 30 days to join the union; § 2, Eleventh provides for 60 days.

I also question placing much reliance on RLA legislative history to interpret a provision of the Taft-Hartley Act. It is better to focus on the history of the Act one is trying to interpret, rather than on a few remarks made during the debate on an entirely different bill. To me, the history of the Taft-Hartley Act itself is a surer guide to its meaning than general comments made years later, and I think that it supplies the answer to the issue of statutory construction that this case presents.

## II. Constitutional Claim

Essential to plaintiffs' first amendment claim is a finding of state action.[8] "It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgement by government, federal or state." *Hudgens v. NLRB*, 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196 (1976). Thus the challenged use of agency fees is subject to constitutional scrutiny only if it is conduct "fairly attributable" to state or federal government. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). Plaintiffs do not

argue that this conduct is fairly attributable to state government, and do not persuade me that it is fairly attributable to the federal government.

Defendants' use of agency fees is not fairly attributable to the federal government because it fails to satisfy the Supreme Court's two-part standard for determining the existence of state action. Under this standard, "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Lugar*, 457 U.S. at 937, 102 S.Ct. at 2753. Further, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* at 937, 102 S.Ct. at 2754. These inquiries overlap to some extent, reflecting "the necessarily fact-bound inquiry" that confronts us. *Id.* at 939, 102 S.Ct. at 2755.

The first step of the *Lugar* inquiry requires a determination of whether the alleged deprivation results from "the exercise of a right or privilege having its source in state authority." *Lugar*, 457 U.S. at 939, 102 S.Ct. at 2755. The agency shop agreement here, and the attendant use of the plaintiffs' compelled fees, do not result in any direct way from the exercise of such power. Nothing in the NLRA compels the adoption of an agency shop agreement; the Act simply provides that federal law does not "preclude" such an agreement between an employer and its employees' bargaining representative. 29 U.S.C. § 158(a)(3). Nor does the Act preempt contrary state law; it merely permits agency shop agreements where there is no state "right to work" law. 29 U.S.C. § 164(b). As the Senate Report on the original NLRA noted, "the bill does nothing to facilitate closed-shop agreements or to make them legal in any

---

**8.** I do not think that defendants argue that federal courts lack jurisdiction of the plaintiffs' constitutional claim. Rather, they argue that, because the challenged union activity is not state action, plaintiffs have failed to state a cognizable claim. Thus defendants' belated motion to dismiss for lack of state action was brought under Fed.R.Civ.P. 12(b)(6) (failure to

state a claim) rather than Rule 12(b)(1) (lack of jurisdiction). This was an appropriate way to raise the state action issue. *Cf. Modaber v. Culpepper Memorial Hospital, Inc.*, 674 F.2d 1023 (4 Cir.1982) (Russell, J.) (affirming dismissal for failure to state a claim because no state action).

State where they may be illegal." S.Rep. No. 573, 74th Cong., 1st Sess. 11–12 (1935), *quoted in* S.Rep. No. 105, 80th Cong., 1st Sess. 6 (1947); *see also Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board,* 336 U.S. 301, 308–10, 69 S.Ct. 584, 588–89, 93 L.Ed. 691 (1949). The Taft-Hartley Act provided no significant encouragement to enter into union security agreements either, banning the closed shop and letting state law continue to determine the legality of the agency shop.

The NLRA's policy of neutrality regarding agency shop agreements does not make entering into such an agreement an exercise of a government-created right. "[I]t is well settled that a state's mere authorization of private conduct does not justify a finding of state action." *Kolinske v. Lubbers,* 712 F.2d 471, 478 (D.C.Cir.1983) (holding that NLRA's agency shop provision does not satisfy either part of *Lugar* test); *see also Price v. International Union, U.A.W.,* No. H-84-1221 (D.Conn. Apr. 11, 1985) (same).

The only right exercised here that can in any way be said to "cause" the alleged deprivation is the right of an exclusive bargaining representative to make a collective agreement with an employer that is binding on all employees. The exercise of this exclusive bargaining power, it is true, "causes" the alleged deprivation in the limited sense that, but for such power, the union would be less likely to secure an agency shop agreement and thus plaintiffs' fees. This causal link, however, is too attenuated to attribute state action to defendants here, as the second part of the *Lugar* approach makes clear.

The second *Lugar* inquiry is whether an NLRA union can "fairly be said to be a state actor." "Something more" is required to convert a private party into a state actor than the exercise of statutory rights. *Cf. Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 436 U.S. 149 (1978) (warehouseman's exercise of statutory right to sell goods on which storage charges not paid was not state action). Otherwise, "private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them." *Lugar,* 457 U.S. at 937, 102 S.Ct. at 2754.

Monopoly status, which is what the right to be exclusive bargaining agent gives the union, is by itself insufficient to make a private party's acts state action. This issue was settled in *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). The Supreme Court there held that government-conferred monopoly power alone was insufficient to establish state action in the context of a due process claim against an electrical utility. *Id.* at 351–52, 95 S.Ct. at 453–54. The Court refused to find state action in suits against state-created monopolists where "there was insufficient relationship between the challenged actions of the entities involved and their monopoly status." *Id.* at 352, 95 S.Ct. at 454.

The majority sees in the unions' monopoly status a nexus with the challenged actions sufficient to justify a finding of state action. It notes in particular the Supreme Court's recognition of the extent of union power in *Steele v. Louisville & Nashville R. Co.,* 323 U.S. 192, 202, 65 S.Ct. 226, 232, 323 U.S. 192 (1944): "Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body...." *See ante* at p. 1207. This was exactly the argument made by the plaintiffs in *United Steelworkers of America v. Sadlowski,* 457 U.S. 102, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982), but rejected by the Court. There plaintiffs challenged a union rule prohibiting nonmember contributions in union elections as, *inter alia,* state action violating the first amendment. The plaintiffs pointed to the monopoly power conferred on unions over a given employer's job market. They argued, also citing *Steele,* that because of its exclusive bargaining power the union was "clothed with power not unlike that of a legislature which is subject to constitutional limitations...." Brief for Respondent Sadlowski at 48; *see also* Reply Brief for Petition-

er Steelworkers at 9. The Court dismissed this argument in a footnote for lack of state action. *Sadlowski* at 121 n. 16, 102 S.Ct. at 2350 n. 16.

The existence of federal contract enforcement machinery in the NLRA is also insufficient to transform a union's activity into state action. Thus the Supreme Court detected no state action in *United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). There plaintiffs challenged an enforceable collective bargaining agreement providing for affirmative action hiring. Before addressing plaintiffs' Title VII challenge, the Court stated that the challenged plan "does not involve state action." *Id.* at 200, 99 S.Ct. at 2726, *cited in Sadlowski* at 121 n. 16, 102 S.Ct. at 2350 n. 16; *see also American Communications Association v. Douds,* 339 U.S. 382, 402, 70 S.Ct. 674, 685–86, 94 L.Ed. 925 (1950) ("We do not suggest that labor unions which utilize the facilities of the National Labor Relations Board become Government agencies or may be regulated as such.")

The lack of a sufficient nexus here between the government's involvement and the private party's challenged actions parallels the situation in *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).[9] There the Supreme Court rejected the argument that extensive government regulation and 90% subsidization of a private school for problem students made the school a state actor. Several employees claimed that firing them for criticizing school policy violated the First Amendment. The Court refused to find state action, even though the state's continuing support of the school enabled it to limit the free speech of a certain portion of the labor force (teachers at the school). In finding no state action, the Court pointed to the interposed conduct of a private party exercising independent judgment; this judgment, rather than the government's

involvement, yielded the challenged action. *Id.* at 839–42, 102 S.Ct. at 2770–72.

Here the independent judgment of employees, employers, and unions separates the potential for union monopoly bargaining power conferred by the federal government from the alleged free speech deprivation. I do not think that *Rendell-Baker* can be distinguished on the ground that the instant case is one in which the parties act under the compulsion of federal law. Federal legislation has not compelled the establishment of unions, nor has it compelled or even encouraged the adoption of agency shop agreements, as shown above. Indeed, the NLRA does not compel the acceptance of any collective bargaining terms. *See* 29 U.S.C. § 158(d). Rather, the employees, employers, and unions make these choices.

The NLRA differs in its general policy of neutrality regarding agency shop agreements from the Railway Labor Act. This case is therefore distinguishable from *Railway Employees Dept. v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956), which is asserted to compel a finding of state action in this case. There the Supreme Court found in the RLA the "something more" required to convert a union into a state actor. In that case plaintiffs sued to enjoin enforcement of a union security agreement in Nebraska, where a right-to-work law prohibited labor agreements from requiring union membership. The Court found governmental action because the RLA pre-empted the state right-to-work law, and thus permitted the challenged union shop provision:

> If private rights are being invaded, it is by force of an agreement made pursuant to federal law which expressly declares that state law is superseded ... In other words, the federal statute is the source of the power and authority by which any private rights are lost or sacrificed....

*Id.* at 232, 76 S.Ct. at 718. Because of the RLA's federal preemption, the Court concluded, "[a] union agreement made pursu-

---

**9.** For further discussion comparing *Rendell-Baker* to the union situation, see *Kolinske,* 712 F.2d at 479–80.

ant to the Railway Labor Act has ... the *imprimatur* of the federal law upon it...." *Id.* at 232, 76 S.Ct. at 718 (emphasis added).

The basis for finding government action in *Hanson*—the federal imprimatur, or mark of approval, on agency shop agreements that the Supreme Court discerned in the preemption of all contrary state law—is lacking in the NLRA. The Court noted this distinction in *Hanson* itself:

> The parallel provision in § 14(b) of the Taft-Hartley Act ... makes the union shop agreement give way before a state law prohibiting it.

*Id.* at 232 n. 5, 76 S.Ct. at 718. It noted the distinction again in *Abood,* emphasizing that federal preemption was the basis for finding government action:

> Unlike § 14(b) of the National Labor Relations Act, 29 U.S.C. § 164(b), the Railway Labor Act preempts any attempt by a State to prohibit a union-shop agreement. Had it not been for that federal statute, the union-shop provision at issue in *Hanson* would have been invalidated under Nebraska law. *The Hanson Court accordingly reasoned that government action was present....*

*Abood,* 431 U.S. at 218 n. 12, 97 S.Ct. at 1791 n. 12 (emphasis added).

Lacking the preemption provision, the NLRA places no federal imprimatur on agency shop clauses. State law rather than federal law is "the source of power and authority for such agreements" under the NLRA. The rationale for finding federal government action in *Hanson,* then,

does not support such a finding here. Most courts have therefore found that *Hanson* does not compel a finding of state action for an agency shop agreement made under the NLRA or an analogous state statute. *See Kolinske v. Lubbers,* 712 F.2d 471, 476 (D.C.Cir.1983); *Reid v. McDonnell Douglas Corp.,* 443 F.2d 408, 410 (10 Cir. 1971) ("[w]hatever the wisdom of this reasoning for the Railway Labor Act, it has no applicability to the National Labor Relations Act"); *Linscott v. Millers Falls Co.,* 440 F.2d 14 (1 Cir.) (Coffin, J., concurring in judgment), *cert. denied,* 404 U.S. 872, 92 S.Ct. 77, 30 L.Ed.2d 116 (1971); *Price,* No. H–84–1221, slip op. at 11 (D.Conn. April 11, 1985); *Pasillas v. Agricultural Labor Relations Board,* 202 Cal.Rptr. 739 (Cal.App. 1. Dist.1984) (following *Kolinske* and *Reid* in finding *Hanson* not to control state action question for state labor law patterned after NLRA). *But see Seay v. McDonnell Douglas Corporation,* 427 F.2d 996, 1003 (9 Cir.1970) (assuming without discussion that *Hanson* controls finding of state action in NLRA context); *Linscott, supra* (majority opinion).[10]

The other case asserted to be controlling is *Abood.* There employees challenged the agency shop clause in a public sector collective bargaining agreement. A state statute patterned on the NLRA authorized such a clause. The Court assumed that this public employment contract involved state action. It upheld the use of agency shop fees to support collective bargaining, but found the use of such fees for political activities unconstitutional.

---

**10.** The majority protests that the preemption distinction emphasized by the Supreme Court in *Hanson* and *Abood* is irrelevant. The present case, it notes, arises in a state that does not prohibit agency shop clauses, so that agency shops are permitted in Maryland under both federal acts. "So far as an agency shop under section 8(a)(3) in Maryland is concerned, it stands the same as the similar agency shop under section 2, Eleventh of the RLA." Majority opinion, *ante* at 1206. Maryland law and the NLRA, however, merely permit private parties to negotiate an agency shop agreement. Neither Maryland law nor the NLRA encourages or

requires such a provision, and, as noted above, "it is well settled that a state's mere authorization of private conduct does not justify a finding of state action." *Kolinske,* 712 F.2d at 478. The RLA, on the other hand, encourages agency shop agreements by preempting all contrary state law, and thus mandates a finding of federal government action under *Hanson. Hanson*'s holding is not limited to states with a prohibition against railway agency shop clauses on the books for the RLA to preempt, since the RLA also has prevented states that might otherwise have enacted such a prohibition from doing so.

*Abood* is distinguishable on the state action issue because it involved the state in the roles of both legislator and employer. *See also Kolinske,* 712 F.2d at 477 (holding *Abood* distinguishable). I do not read the statement in *Abood* that "differences between public- and private-sector collective bargaining simply do not translate into differences in First Amendment rights," 431 U.S. at 232, 97 S.Ct. at 1798, as meaning that the differences between public- and private-sector bargaining do not translate into differences for *state action* purposes. Indeed, the obvious difference for state action purposes is that in the private sector case the state may merely authorize a private agreement. In the public sector cases, the state not only authorizes the agreement in its role as legislator, but affirmatively enters into such an agreement in its role as employer.

The *Abood* opinion compared the public sector case with the earlier private sector RLA cases "simply because the existence of governmental action in both contexts requires analysis of the free expression question". *Id.* at 226 n. 23, 97 S.Ct. at 1795 n. 23. The comment that "differences between public- and private-sector bargaining simply do not translate into differences in First Amendment rights" was a response to the argument that the greater *extent* of government action in the public sector case required more extensive first amendment safeguards than the government action in the RLA cases. *See id.* ("Hanson nowhere suggested that the constitutional scrutiny of the union-shop agreement was watered down because the governmental action operated less directly than is true in a case such as the present one.") At the same time, the Court explicitly noted that "[n]othing in our opinion ... indicates that private collective-bargaining agreements are, without more, subject to constitutional constraints." *Id.*

It is for these reasons that I would reverse the judgment of the district court and direct it to dismiss the complaint.